**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA**

JOSHUA STEFFENS, Derivatively on Behalf of Nominal Defendant ZOOMINFO TECHNOLOGIES, INC.,

            Plaintiff,

    v.

HENRY SCHUCK, PETER CAMERON HYZER, KEITH ENRIGHT, ASHLEY EVANS, ALISON GLEESON, MARK MADER, PATRICK MCCARTER, D. RANDALL WINN, TODD CROCKETT, and MITESH DHRUV,

            Defendants,

    and

ZOOMINFO TECHNOLOGIES, INC.,

            Nominal Defendant.

Case No.  3:25-cv-05088

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT**

**DEMAND FOR JURY TRIAL**

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

    Plaintiff Joshua Steffens ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant ZoomInfo Technologies, Inc. ("ZoomInfo" or the "Company"), against current and former members of the Company's board of directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law.  Plaintiff

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 1
Case No.  3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding ZoomInfo, legal filings, news reports, securities analysts' reports about the Company, the related securities class action captioned *City of Pontiac Police and Fire Retirement System v. ZoomInfo Technologies, Inc., et al.,* Case No. 3:24-cv-05739-TMC (W.D. Wash.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought by Plaintiff on behalf of ZoomInfo against certain of its officers and current and former members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties between at least November 10, 2020 and August 5, 2024, inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2. Founded in 2007, ZoomInfo is a software and data company that provides services for sales, marketing, operations, and recruiting teams.

3. According to the Company's public filings, ZoomInfo's cloud-based operating platform delivers comprehensive and high-quality intelligence and analytics to provide sales,

---

[1] The Individual Defendants are Henry Schuck ("Schuck"), Peter Cameron Hyzer ("Hyzer"), Keith Enright ("Enright"), Ashley Evans ("Evans"), Alison Gleeson ("Gleeson"), Mark Mader ("Mader"), Patrick McCarter ("McCarter"), D. Randall Winn ("Winn"), Todd Crockett ("Crockett"), and Mitesh Dhruv ("Dhruv"). Defendants" means ZoomInfo and the Individual Defendants.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 2
Case No. 3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

marketing, operations, and recruiting professionals accurate information and insights on the organizations and professionals they target.

4.    The Company generates substantially all of its revenue from sales of subscriptions to its platform. These subscriptions typically range from one to three years in length and are non-cancelable.

5.    Throughout the Relevant Period, ZoomInfo touted the strength of its customer base, alleging that its customer base spanned a "wide variety of industry verticals," and that as of 2024, ZoomInfo's software was used by over 35,000 companies. The Company alleged that this strong customer base resulted in strong financial results throughout the Relevant Period.

6.    However, in reality, ZoomInfo's customer base was not as strong as it had alleged, with non-payments from customers ultimately causing the Company's financial performance to suffer. Furthermore, in an attempt to try and retain customers to keep up the appearance of a strong customer base and customer retention, ZoomInfo implemented coercive auto-renewal policies during the Relevant Period, which required clients to notify the Company of non-renewal at least sixty days before the end of their contract term.

7.    Throughout the Relevant Period, the Individual Defendants issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (a) the COVID-19 pandemic had temporarily inflated the use of the Company's platform; (b) the increase in the Company's customers and business was only temporary due to the pandemic; (c) in order to retain the diminishing customer base, the Company instituted deceptive and coercive auto-renewal policies; (d) as a result, the Company's reported revenues, operating income, and customer and retention metrics were materially overstated; (e) the Company failed to maintain adequate oversight and

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 3
Case No.  3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

1    internal controls over its financial reporting; and (f) as a result of the foregoing, positive statements

2    regarding the Company's business, operations, and prospects were materially false and misleading

3    and lacked a reasonable basis at all relevant times.

4    8.    The truth was revealed on August 5, 2024, when the Company issued a press release

5    announcing financial results for the second quarter of 2024 (the "2Q24 Earnings Release") and

6    announced that the Company was incurring a $33 million charge due to non-payments from

7    customers and that, as a result, the Company was implementing a new business risk model.

8    9.    On this news, the price of ZoomInfo stock declined $1.79 per share, or

9    approximately 18%, to close at $8.01 on August 6, 2024.

10    10.    As a result of the foregoing, the Securities Class Action was filed against the

11    Company and Defendants Schuck and Hyzer, among others, exposing the Company to massive

12    class-wide liability and costs related to defending itself in the Securities Class Action.

13    11.    Furthermore, as detailed herein, as a direct and proximate result of the Individual

14    Defendants' misconduct, the Company repurchased its own stock at artificially inflated prices

15    during the Relevant Period, costing the Company hundreds of millions of dollars.

16    12.    Moreover, in light of the breaches of fiduciary duty by the Individual Defendants,

17    most of whom are the Company's current directors, the substantial likelihood of the directors'

18    liability in this derivative action and the Securities Class Action, and that the Individual Defendants

19    are beholden to each other based on their longstanding business and personal relationships, the

20    Individual Defendants do not possess the requisite level of disinterestedness and independence to

21    consider a demand to commence litigation against themselves and the other Individual Defendants

22    on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because,

23    as further detailed herein, demand would be a futile and useless act.

24    VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 4
Case No. 3:25-cv-05088

1

2                          **JURISDICTION AND VENUE**

3        13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section

4   27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein

5   for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17

6   C.F.R.§240.14a-9) promulgated thereunder by the SEC, Section 10(b) of the Exchange Act and

7   Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC, and Section 20(a) of the

8   Exchange Act (15 U.S.C. § 78t(a)).

9        14.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant

10  to 28 U.S.C. § 1367(a).

11       15.    This action is not a collusive action designed to confer jurisdiction on a court of the

12  United States that it would not otherwise have.

13       16.    In connection with the acts, conduct and other wrongs complained of herein,

14  Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

15  the United States mail, and the facilities of a national securities market.

16       17.    Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and

17  28 U.S.C. § 1391 because ZoomInfo is headquartered in this District, Defendants have conducted

18  business in this District, a substantial portion of the transactions and wrongs complained of herein

19  occurred in this District, and Defendants have received substantial compensation in this District

20  by engaging in numerous activities that had an effect in this District.

21                                **PARTIES**

22  *Plaintiff*

23       18.    Plaintiff is, and has been at all relevant times, a continuous shareholder of

24  VERIFIED SHAREHOLDER DERIVATIVE
    COMPLAINT - 5
    Case No.  3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

1    ZoomInfo.

2    ***Nominal Defendant***

3        19.    Nominal Defendant ZoomInfo is a Delaware corporation with its principal

4    executive offices located at 805 Broadway Street, Suite 900, Vancouver, Washington 98660.

5    ZoomInfo's common stock is traded on the NASDAQ Stock Market ("NASDAQ") under the

6    ticker symbol "ZI."

7    ***Individual Defendants***

8        20.    Defendant Schuck is a co-founder of the Company and has served as Chairman of

9    the Board and as Chief Executive Officer ("CEO") of the Company since its formation in

10   November 2019. Schuck has also served as CEO and a director of ZoomInfo Holdings LLC[2] since

11   2007. As set forth in the Company's annual proxy statements filed with the SEC, Defendant

12   Schuck received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2021 | $1,309,234 |
| 2022 | $834,971 |
| 2023 | $4,973,764 |

        21.    Defendant Hyzer served as Chief Financial Officer ("CFO") of the Company from

November 2019 until October 2024. Hyzer also served as CFO of ZoomInfo Holdings LLC. As

set forth in the Company's annual proxy statements filed with the SEC, Defendant Hyzer received

the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2021 | $4,057,761 |
| 2022 | $17,936,399 |
| 2023 | $573,250 |

---

[2] ZoomInfo Holdings LLC, formerly known as DiscoverOrg Holdings, LLC, is a subsidiary of the
Company.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 6
Case No.  3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

1

2     22.    Defendant Enright has served as a director of the Company since March 2020.

3  Enright also serves as Chair of the Board's Privacy, Security and Technology Committee and as a

4  member of the Board's Audit Committee. Enright previously served on the board of managers of

5  ZoomInfo Holdings LLC from March 2020 until June 2020. As set forth in the Company's annual

6  proxy statements filed with the SEC, Defendant Enright received the following in compensation

7  from the Company during the Relevant Period:

| Year | Total Compensation |
| --- | --- |
| 2021 | $265,014 |
| 2022 | $272,541 |
| 2023 | $277,316 |

10     23.    Defendant Evans has served as a director of the Company since February 2020.

11  Evans also serves Chair of the Board's Audit Committee and as a member of the Board's

12  Compensation Committee. Evans previously served on the board of managers of ZoomInfo

13  Holdings LLC from 2018 until June 2020. As set forth in the Company's annual proxy statements

14  filed with the SEC, Defendant Evans received the following in compensation from the Company

15  during the Relevant Period:

| Year | Total Compensation |
| --- | --- |
| 2022 | $189,686 |
| 2023 | $262,316 |

18     24.    Defendant Gleeson has served as a director of the Company since July 2022.

19  Gleeson also serves as a member of the Board's Nominating and Corporate Governance

20  Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant

21  Gleeson received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
| --- | --- |
| 2022 | $210,352 |
| 2023 | $256,316 |

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 7
Case No. 3:25-cv-05088

25.     Defendant Mader has served as a director of the Company since February 2020. Mader also serves as a member of the Board's Audit Committee. Mader previously served on the board of managers of ZoomInfo Holdings LLC from February 2020 until June 2020. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Mader received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2021 | $260,014 |
| 2022 | $260,041 |
| 2023 | $262,316 |

26.     Defendant McCarter has served as a director of the Company since February 2020. McCarter also serves as Chair of the Board's Nominating and Corporate Governance Committee and as a member of the Board's Compensation Committee. McCarter previously served on the board of managers of ZoomInfo Holdings LLC from 2018 until June 2020.

27.     Defendant Winn has served as a director of the Company since February 2020. Winn also serves as Chair of the Board's Compensation Committee and as a member of the Board's Privacy, Security and Technology Committee. Winn previously served on the board of managers at ZoomInfo Holdings LLC from 2014 until June 2020. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Winn received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2022 | $273,166 |
| 2023 | $274,816 |

28.     Defendant Crockett served as a director of the Company from February 2020 until July 2024. Crockett also served as a member of the Board's Compensation Committee and Nominating and Corporate Governance Committee. Crockett previously served on the board of

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 8
Case No. 3:25-cv-05088

managers at ZoomInfo Holdings LLC from 2014 until June 2020.

29.     Defendant Dhruv served as a director of the Company from February 2020 until 2024. Dhruv also served as Chair of the Board's Audit Committee. Dhruv previously served as a member of the board of managers of ZoomInfo Holdings LLC from February 2020 until June 2020. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Dhruv received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2021 | $270,014 |
| 2022 | $270,041 |
| 2023 | $272,316 |

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

30.     By reason of their positions as officers and/or directors of ZoomInfo, and because of their ability to control the business and corporate affairs of ZoomInfo, the Individual Defendants owed ZoomInfo and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage ZoomInfo in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of ZoomInfo and its shareholders so as to benefit all shareholders equally.

31.     Each director and officer of the Company owes to ZoomInfo and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

32.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of ZoomInfo, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 9
Case No.  3:25-cv-05088

33.     To discharge their duties, the officers and directors of ZoomInfo were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

34.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of ZoomInfo, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

35.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to ensure that ZoomInfo implemented and properly monitored the Company's internal controls over financial reporting; to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations; and to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 10
Case No.  3:25-cv-05088

BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

1      36.     To discharge their duties, the officers and directors of ZoomInfo were required to

2  exercise reasonable and prudent supervision over the management, policies, practices, and internal

3  controls of the Company.  By virtue of such duties, the officers and directors of ZoomInfo were

4  required to, among other things:

5              (i)     ensure that the Company was operated in a diligent, honest, and prudent

6       manner in accordance with the laws and regulations of Washington and the United States,

7       and pursuant to ZoomInfo's own Code of Business Conduct and Ethics (the "Code of

8       Conduct");

9              (ii)    conduct the affairs of the Company in an efficient, business-like manner so

10      as to make it possible to provide the highest quality performance of its business, to avoid

11      wasting the Company's assets, and to maximize the value of the Company's stock;

12             (iii)   remain informed as to how ZoomInfo conducted its operations, and, upon

13      receipt of notice or information of imprudent or unsound conditions or practices, to make

14      reasonable inquiry in connection therewith, and to take steps to correct such conditions or

15      practices;

16             (iv)    establish and maintain systematic and accurate records and reports of the

17      business and internal affairs of ZoomInfo and procedures for the reporting of the business

18      and internal affairs to the Board and to periodically investigate, or cause independent

19      investigation to be made of, said reports and records;

20             (v)     maintain, implement, and monitor an adequate and functioning system of

21      internal legal, financial, and management controls, such that ZoomInfo's publicly

22      disclosed financial information would be accurate;

23             (vi)    exercise reasonable control and supervision over the public statements

24  VERIFIED SHAREHOLDER DERIVATIVE
    COMPLAINT - 11
    Case No.  3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

37.    Each of the Individual Defendants further owed to ZoomInfo and the shareholders the duty of loyalty requiring that each favor ZoomInfo's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

38.    At all times relevant hereto, the Individual Defendants were the agents of each other and of ZoomInfo and were at all times acting within the course and scope of such agency.

39.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by ZoomInfo.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

40.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 12
Case No.  3:25-cv-05088

41.   The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

42.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

43.   In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of ZoomInfo, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

44.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

45.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of ZoomInfo and at all times acted within the course and scope of such agency.

**ZOOMINFO'S CODE OF CONDUCT**

46.   ZoomInfo's Code of Conduct begins by stating "Integrity, honesty and sound

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 13
Case No.  3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

1  judgment are fundamental to the reputation and success of ZoomInfo Technologies Inc."

2      47.    The Code of Conduct further states that it applies to "all directors, officers

3  (including the principal executive officer, principal financial officer, principal accounting officer,

4  controller and persons performing similar functions) and employees of the Company (collectively,

5  "Covered Parties")."

6      48.    In a section titled "Conflicts of Interest," the Code of Conduct states, in relevant

7  part:

8          It is the Company's policy that all Covered Parties avoid any conflict between their
           personal interests and those of the Company. The purpose of this policy is to ensure
9          that the Company's honesty and integrity, and therefore its reputation, are not
           compromised. The fundamental principle guiding this policy is that no Covered
10         Party should have, or appear to have, personal interests or relationships that actually
           or potentially conflict with the best interests of the Company. In the case of the
11         Company's non-employee directors, compliance with this Code is subject to
           provisions of the Company's certificate of incorporation, bylaws, and any
12         stockholders agreement with the Company.

13     49.    In a section titled "Compliance with Laws, Rules and Regulations," the Code of

14  Conduct states:

15         Obeying the law, both in letter and in spirit, is one of the foundations on which the
           Company's ethical standards are built. In conducting the business of the Company,
16         Covered Parties must respect and obey the laws of the jurisdictions in which we
           operate. Although not all Covered parties are expected to know the details of these
17         laws, it is important to know enough about the applicable local, state and national
           laws to determine when to seek advice from the Company's General Counsel or
18         other appropriate personnel. If a law conflicts with any Company policy or this
           Code, you must comply with the law. There are serious consequences for failing to
19         follow any applicable laws, rules and regulations, including termination of service
           and potential criminal and civil penalties.

20     50.    In a section titled "Inappropriate Trading," the Code of Conduct states the

21  following, in pertinent part:

22         *Prohibition Against Insider Trading*

23         The federal securities laws prohibit any person who is in possession of material,
           non-public information from engaging in securities transactions on the basis of such

24  VERIFIED SHAREHOLDER DERIVATIVE
    COMPLAINT - 14
    Case No.  3:25-cv-05088

BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

information and from communicating such information to any other person for such use. Transacting in securities of the Company, or any other company, while you possess material, nonpublic information is known as "insider trading." "Tipping," which is also prohibited, means communicating such material, nonpublic information to another for their or its use. Any of these actions may amount to "insider trading" and are strictly prohibited.

51.     In a section titled "Accuracy of Records," the Code of Conduct states, in relevant part, that:

It is the Company's policy to make full, fair, accurate, timely and understandable disclosures in compliance with applicable laws and regulations in all reports and documents that the Company files with, or submits to, the U.S. Securities and Exchange Commission, state agencies, and in all other public communications made by the Company.

The integrity, reliability and accuracy in all material respects of the Company's books, records and financial statements are fundamental to the Company's continued and future business success. In addition, as a company whose stock is publicly traded, the Company is subject to a number of laws and regulations that govern our business records, including U.S. securities laws. The Company must record its financial activities in compliance with all applicable laws and accounting practices and provide current, complete and accurate information to any and all government agencies. No Covered Party may cause the Company to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner. In addition, no Covered Party may create any false or artificial documentation or book entry for any transaction entered into by the Company. Similarly, Covered Parties who have responsibility for accounting and financial reporting matters have a responsibility to accurately record all funds, assets and transactions on the Company's books and records.

## ZOOMINFO'S AUDIT COMMITTEE CHARTER

52.     Pursuant to ZoomInfo's Audit Committee Charter, the Audit Committee's purpose is to:

A. Provide assistance to the Board of Directors (the "Board of Directors") of ZoomInfo Technologies Inc. (the "Company") with respect to its oversight of:

(i)     The quality and integrity of the Company's financial statements, including oversight of the Company's accounting and financial reporting processes and financial statement audits;

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 15
Case No.  3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

  (ii) The Company's compliance with legal and regulatory requirements applicable to financial statements and accounting and financial reporting processes;

  (iii) The independent registered public accounting firm's qualifications, performance and independence;

  (iv) The performance of the Company's internal audit function;

  (v) Risk assessment and management, particularly with respect to financial risk exposure; and

  (vi) The Company's environmental, social, and governance ("ESG") related strategy, policies, practices, risk assessment and management, and public disclosures.

B. Prepare the audit committee report required by the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

53. In a section titled "Responsibilities and Duties," the Audit Committee Charter tasks the Audit Committee with the following responsibilities and duties, among others:

<u>Documents/Reports Review</u>

1. Review and discuss with management and the independent registered public accounting firm prior to public dissemination the Company's annual audited financial statements and quarterly financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

2. Discuss with the independent registered public accounting firm the matters required to be discussed by the applicable auditing standards adopted by the PCAOB and approved by the SEC from time to time, including any critical audit matters.

3. Review and discuss with management and the independent registered public accounting firm the Company's earnings press releases (paying particular attention to the use of any "pro forma" or "adjusted" non-GAAP information and measures), as well as financial information and earnings guidance provided to analysts and rating agencies. The Committee's discussion in this regard may be general in nature (e.g., discussion of the types of information to be disclosed and the type of presentation to be made) and need not take place in advance of each earnings release or each instance in which the Company may provide earnings guidance.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 16
Case No. 3:25-cv-05088

4. Review and discuss with management and the independent registered public accounting firm any major issues arising as to the adequacy and effectiveness of the Company's internal controls, any actions taken in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting.

5. Review and discuss with the independent registered public accounting firm a draft of the auditor's report.

Independent Registered Public Accounting Firm

6. Be solely and directly responsible for the appointment, compensation, retention, oversight and, when necessary, termination of any independent registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company (including the resolution of disagreements between management and such firm regarding financial reporting). . . .

Accounting and Financial Reporting Process

12. In consultation with the independent registered public accounting firm, management and the internal auditors (or other personnel or service providers responsible for the internal audit function), review the integrity of the Company's financial reporting processes. In that regard, the Committee must obtain, review and discuss with management and the independent registered public accounting firm reports from management and the independent registered public accounting firm regarding:

- all critical accounting policies and practices to be used by the Company;

- analyses prepared by management and/or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including all alternative treatments of financial information within generally accepted accounting principles related to material items that have been discussed with the Company's management, the ramifications of the use of the alternative disclosures and treatments on the Company's financial statements and the treatment preferred by the independent registered public accounting firm;

- major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles;

- major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; and

- any other material written communications between the independent registered public accounting firm and the Company's management, such as any management letter or schedule of unadjusted differences.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 17
Case No. 3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

13. Review periodically the effect of regulatory and accounting initiatives, as well as off-balance sheet structures (if any), on the financial statements of the Company.

14. Review with the independent registered public accounting firm (i) any problems or difficulties encountered by such firm in the course of the review or audit work, including any restrictions on the scope of its activities or on access to requested information, and any significant disagreements with management and (ii) management's responses to such matters. Without excluding other possibilities, the Committee may wish to review with the independent registered public accounting firm (i) any accounting adjustments that were noted or proposed by such firm but were "passed" (as immaterial or otherwise), (ii) any communications between the audit team and such firm's national office respecting auditing or accounting issues presented by the engagement and (iii) any "management" or "internal control" letter issued, or proposed to be issued, by the independent registered public accounting firm to the Company.

Internal Audit

15. Oversee the Company's internal audit function, which may be outsourced to a third-party service provider.

16. Review the significant reports to management prepared by the internal auditors (or other personnel or service providers responsible for the internal audit function) and management's responses.

17. Review and discuss with management, and if appropriate, the independent registered public accounting firm and/or any service provider providing internal audit services to the Company, the responsibilities, budget and staffing of the Company's internal audit function.

Legal Compliance/General

18. Periodically review and discuss with the Company's General Counsel, or their designee, any legal matters that have been brought to the Committee's attention and that could have a significant impact on the Company's financial statements.

19. Review and discuss with management and the independent registered public accounting firm the Company's guidelines and policies with respect to risk assessment and risk management. The Committee should discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

20. Set clear policies for the Company's hiring of partners or employees or former partners or former employees of the independent registered public accounting firm. At a minimum, these policies must provide that any independent registered public accounting firm may not provide audit services to the Company if the chief executive officer, controller, chief financial officer, chief accounting officer or any person serving in an equivalent capacity for the Company was employed by the independent registered public accounting firm and participated in any capacity in the audit of the Company during the one-year period preceding the date of the initiation of the audit.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 18
Case No. 3:25-cv-05088

BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

21. Establish procedures for: (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

22. Oversee, review and periodically update the Company's Code of Business Conduct and Ethics (the "Code") (including review of requests of waivers thereof by executive officers and directors) and the Company's system to monitor compliance with and enforce the Code.

23. Unless otherwise approved or ratified pursuant to the Board's "Related Person Transaction Policy," the Committee shall review and approve or ratify all transactions between the Company and any Related Person that are required to be disclosed pursuant to Item 404(a) of Regulation S-K ("Item 404(a)"). "Related Person" shall have the meaning given to such term in Item 404(a), as amended from time to time. Discuss with the independent registered public accounting firm its evaluation of the Company's identification of, accounting for, and disclosure of its relationships with related parties as set forth under the standards of the PCAOB.

24. Review and approve at least on an annual basis the decisions by management to enter into derivative transactions on a cleared or non-cleared basis, and the policies and processes of the Company related thereto, and review and recommend to the Board of Directors on matters pertaining to the Company's derivative transactions and hedging strategy. . . .

Reports

28. Prepare the Audit Committee report required by the SEC to be included in the Company's annual proxy statement.

29. Report regularly to the Board of Directors including:

(i)   with respect to any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the qualification, performance and independence of the Company's independent registered public accounting firm or the performance of the internal audit function;

(ii)   following meetings of the Committee; and

(iii)   with respect to such other matters as are relevant to the Committee's discharge of its responsibilities

The Committee shall provide such recommendations to the Board of Directors as the Committee may deem appropriate. The report to the Board of Directors may take the form of an oral report by the Chairperson or any other member of the Committee designated by the Committee to make such report.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 19
Case No. 3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

30. Maintain minutes or other records of meetings and activities of the Committee.

## SUBSTANTIVE ALLEGATIONS

### Background

54.    Founded in 2007, ZoomInfo is a software and data company that provides services for sales, marketing, operations, and recruiting teams.

55.    The Company went public through an initial public offering on June 8, 2020.

56.    According to the Company's public filings, ZoomInfo's cloud-based operating platform delivers comprehensive and high-quality intelligence and analytics to provide sales, marketing, operations, and recruiting professionals accurate information and insights on the organizations and professionals they target.

57.    The Company's platform uses an artificial intelligence and machine learning powered engine that gathers data from millions of sources and standardizes, matches to entities, verifies, cleans, and applies the processed data to companies and people at scale.

58.    ZoomInfo purports that it has a "large and diversified customer base [that] spans a wide variety of industry vehicles, including software, business services, manufacturing, telecommunications, financial services, media and internet, transportation, education, hospitality, and real estate." According to the Company's annual report filed on a Form 10-K with the SEC on February 15, 2024 (the "2023 10-K"), the Company serves over 35,000 customers.

59.    The Company states in its public filings that it generates substantially all of its revenue from sales of subscriptions to its platform. These subscriptions are sold to both new and existing customers and the subscription price is based on the functionality, users, and records under management that are included in the contracts. ZoomInfo's subscriptions typically range from one to three years in length and are non-cancelable. The Company typically bills its customers at the beginning of each annual, semi-annual, or quarterly period.

60.    The Company's subscription revenue is recognized ratably over the contract term starting with when the service is made available to the customer. Usage-based revenue is

recognized in the period services are utilized by our customers. The amount of revenue recognized by the Company reflects the consideration the Company expects to be entitled to receive in exchange for its services. The Company's unearned revenue results from cash received or amounts billed to customers in advance of revenue recognized upon the satisfaction of performance obligations. In each of its quarterly and annual reports filed with the SEC, the Company reports the value of its remaining performance obligations ("RPOs").

61.    In reporting client demand and business performance to investors, the Company uses two metrics: (i) net revenue retention ("NRR"), which is calculated based on the annual total contract value ("ACV") of customers; and (ii) RPOs.

62.    Throughout the Relevant Period, the Individual Defendants issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (a) the COVID-19 pandemic had temporarily inflated the use of the Company's platform; (b) the increase in the Company's customers and business was only temporary due to the pandemic; (c) in order to retain the diminishing customer base, the Company instituted deceptive and coercive auto-renewal policies; (d) as a result, the Company's reported revenues, operating income, and customer and retention metrics were materially overstated; (e) the Company failed to maintain adequate oversight and internal controls over its financial reporting; and (f) as a result of the foregoing, positive statements regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Individual Defendants' False and Misleading Statements***

63.    Throughout the Relevant, ZoomInfo touted the strength of its customer base, crediting its strong financial results to its increase in new customers and retention of existing customers.

64.    On November 9, 2020, the Company issued a press release announcing the financial results for the third quarter of 2020 (the "3Q20 Earnings Release"). The 3Q20 Earnings Release

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

reported that the Company's quarterly revenue grew 56% year-over-year, with $123.4 million in revenue for the third quarter of 2020. The 3Q20 Earnings Release also reported that the Company's quarterly operating income was up 41% year-over-year, with $18.4 million in operating income during the quarter. Additionally, in the 3Q20 Earnings Release, Defendant Schuck stated that ZoomInfo "delivered another quarter of ***record results***, as more customers than ever modernized their go-to-market motions with ZoomInfo's data and insights platform." (Emphasis added).

65.    On the same day, the Company held an earnings call for investors and analysts to discuss its financial results for the third quarter of 2020 (the "3Q20 Earnings Call"). On the 3Q20 Earnings Call, Defendant Schuck began by touting the Company's increase in sales, stating, in relevant part:

> This quarter more customers than ever stepped up to modernized their go-to-market motions by adopting ZoomInfo's data and insights platform. In Q3, our team has delivered 41% organic growth over the last year, up 40% from last quarter. Out of 47% adjusted operating margin, we achieved the most adjusted operating income ever in a quarter and year-to-date we have delivered $167 million in unlevered free cash flow. ***Because of the strength that we're seeing across all areas of the business, including record quarterly new sales, record engagement levels and a new high watermark for our customers spending over $100,000 a year with us, we are raising our financial guidance for the full year.***

(Emphasis added).

66.    Defendant Hyzer also highlighted the Company's sales during the 3Q20 Earnings Call, stating, in relevant part:

> Both new sales activity and existing client net expansion improved relative to Q2 and last year. We continued to build momentum and increased win rates throughout the quarter, and this combination of strength in new sales and expansion activity helped drive sequential revenue growth of 10% adjusted for the relative days in each quarter.

67.    During the "Question-and-Answer Session" of the 3Q20 Earnings Call, when asked about what drove the Company's growth during the quarter, Defendant Hyzer stated, in relevant part:

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

That's a great question, Brent. It was **broad-based** across the Board. **We saw really strong new business sales and that's with enterprises and mid-market and SMB customers**. I think one thing to make sure to think about is that, all of our customers are selling to other businesses. So, at the end of the day they were probably less impacted by some of the COVID headwinds that you might see then say restaurant or other folks.

And many of them are pivoting and finding ways to succeed, which happen to be many of the more agile and forward leaning go-to-market teams in the world. So I think our system really helped people to continue to perform. And, I think one of the things that that we continued to see throughout was that the tension or expansion among our customers continue to accelerate month-over-month, throughout the year. **So you know, again, broad-based on both new sales and retention and across all of the different segments of customers.**

(Emphasis added).

68.     Just a few days later, on November 13, 2020, the Company filed its quarterly report for the period ended September 30, 2020 on a Form 10-Q with the SEC (the "3Q20 10-Q"). The 3Q20 10-Q confirmed and repeated the financial results that were announced in the Q320 Earnings Release. *See* ¶ 64. The 3Q20 10-Q also revealed that the Company had total RPOs of $457.6 million for the third quarter, with $349 million of RPOs to be recognized within one year.

69.     The 3Q20 10-Q was signed by Defendant Hyzer and was accompanied by certifications made by Defendants Schuck and Hyzer pursuant to Sections 13a-14(a) and 15d-15(e) of the Exchange Act and Section 302 of the Sarbanes-Oxley Act of 2002 (the "SOX Certifications"). In the SOX Certifications, Defendants Schuck and Hyzer attested to the accuracy of the 3Q20 10-Q.

70.     On December 2, 2020, the Company filed a prospectus on a Form 424(b)(4) with the SEC (the "December 2020 Prospectus"). In the December 2020 Prospectus, the Company highlighted the size and strength of its customer base, stating, in relevant part:

Our software, insights, and data enable over 17,000 companies t sell and market more effectively and efficiently . . . . This broad applicability drives our TAM [total

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 23
Case No.  3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

1    addressable market] of approximately $30 billion, according to our estimates.
     Using the ZoomInfo platform, we have identified over 750,000 global businesses
2    that sell to other businesses and have more than ten employees, which represent our
     potential customers. Our current customer base of over 17,000 implies penetration
3    of approximately 2%.

4    71.    The December 2020 Prospectus also stated that over 720 of the Company's

5    customers spend more than $100,000 in ACV, with 18 customers spending over $1 million in

6    ACV.

7    72.    On February 22, 2021, the Company issued a press release announcing its financial

8    results for the fourth quarter and full year 2020 (the "4Q20 Earnings Release"). In the 4Q20

9    Earnings Release, ZoomInfo reported that its quarterly revenue was up 53% year-over-year, with

10   revenue of $139.8 million for the quarter, and that its quarterly operating income was up 54% year-

11   over-year, with operating income of $29.6 million for the quarter.

12   73.    Additionally, the 4Q20 Earnings Release reported that the Company's yearly

13   revenue was up 62% year-over-year, with revenue of $467.2 million for 2020. The 4Q20 Earnings

14   Release also revealed that the Company closed the year with more than 20,000 customers, with

15   more than 850 customers with $100,000 or greater in annual contract value ("ACV"), and that the

16   Company's annual NRR for 2020 was 108%.

17   74.    In the 4Q20 Earnings Release, Defendant Schuck stated that the Company

18   delivered "another quarter of record results," and credited the Company's financial success to its

19   customer base, stating, in relevant part, "[o]ur success is driven by the success of our customers,

20   as we continue to help companies of all sizes, across all industries, modernize their go-to-market

21   efforts with expanding data, insights, and automation platform."

22   75.    On the same day, the Company held an earnings call for investors and analysts to

23   discuss the financial results for the fourth quarter of 2020 (the "4Q20 Earnings Call"). During the

24   VERIFIED SHAREHOLDER DERIVATIVE
     COMPLAINT - 24
     Case No. 3:25-cv-05088

4Q20 Earnings Call, Defendant Schuck again touted the Company's customer base, stating, in relevant part, "[d]uring the quarter, we set company growth records for new sales, new customers added, customers over $100,000 in ACV, efficiency metrics such as LTV to CAC and we saw broad-based strength across all areas of the business, a truly impressive end to our first year in the public market."

76.     Defendant Hyzer made similar statements about the strength of the Company's customer base during the 4Q20 Earnings Call, stating:

> So currently, we're seeing real strength on both sides, both from new logos and customers coming on, as well as from the expansion opportunity within our existing customer base. And if you look at our largest customers, we had a record quarter in terms of the addition of new customers that are above $100,000 at this point.

77.     During the questions and answers section of the 4Q20 Earnings Call, when asked about the new customers retained during the quarter, Defendant Schuck stated:

> And so you see customers from all sorts of industries now coming to us, and we have a solution that can serve all of their needs. It doesn't matter if you sell into an IT decision-maker or a medical director, if you're selling in France or you're selling in California, the solution can serve up better go-to-market efficiencies for your sales teams regardless of what kind of company you are. And I think what you're seeing is companies, one, making the realization, the digitization of their go-to-market efforts is a must; and two, you see really the investments that we made over the last two years in our go-to-market teams and our product really paying off. ***And so we saw a broad-based momentum, again, from all industries across the world across sizes, and that's the momentum that we don't think is a blip or something that's short lived or short term.***
>
> ***We think that's here to stay***.

(Emphasis added).

78.     On February 26, 2021, the Company filed its annual report for the fiscal year 2020 on a Form 10-K with the SEC (the "2020 10-K"). The 2020 10-K contained the same information regarding the Company's revenue, operating income, customer base, and NRR as the 4Q20

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 25
Case No.  3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

1   Earnings Release. *See* ¶¶ 72-73. In addition, the 2020 10-K reported that the Company had total

2   RPOs of $559 million for 2020, with $432.2 million of the RPOs being current.

3       79.    The 2020 10-K was signed by Defendants Schuck, Crockett, Dhruv, Enright,

4   Evans, Mader, McCarter, Winn, and Hyzer. The 2020 10-K was also accompanied by SOX

5   Certifications from Defendants Schuck and Hyzer, wherein they attested to the accuracy of the

6   2020 10-K.

7       80.    On May 3, 2021, the Company issued a press release announcing its financial

8   results for the first quarter of 2021 (the "1Q21 Earnings Release"). In the 1Q21 Earnings Release,

9   the Company announced that its quarterly revenue was up 50% year-over-year, and its quarterly

10  operating income was up 38% year-over-year, with revenue of $153.3 million and operating

11  income of $28 million for the first quarter of 2021. The 1Q21 Earnings Release also reported that

12  ZoomInfo closed the quarter with more than 950 customers with $100,000 or greater in ACV.

13      81.    Defendant Schuck also touted the Company's success in the 1Q21 Earnings

14  Release, stating that "the first quarter was a strong start to the year," and that the Company was

15  "executing well across all areas of the business" and remains "well-positioned to capitalize on

16  growing market opportunity in the go-to-market intelligence space."

17      82.    On the same day, the Company held an earnings call for investors and analysts to

18  discuss the first quarter financial results (the "1Q21 Earnings Call"). During the 1Q21 Earnings

19  Call, Defendant Schuck highlighted the financial results that the Company reported in the 1Q21

20  Earnings Release, stating:

> The first quarter was marked by strong accelerating growth across all of our business lines. We delivered GAAP revenue of $153 million, representing 50% year-over-year growth and 12% sequentially when adjusted for the number of days in the quarter.

24  VERIFIED SHAREHOLDER DERIVATIVE
    COMPLAINT - 26
    Case No.  3:25-cv-05088

Adjusted operating income was $66 million, representing an operating margin of 43%. These results were driven by dependable execution across the entire company from new business to product development to retention. Our focus on continuous improvement as a core cultural value and the execution we build on top of that has allowed us to deliver our near-term financial results consistently while setting us up for long-term durable growth. We had strong results across all areas of the business, and ***I want to specifically call out that we achieved our best-ever Q1 results this quarter on three dimensions: new business, new customer additions, and retention activity.***

(Emphasis added).

83.    Defendant Schuck went on to emphasize the Company's "strong" customer base and growth:

We doubled the number of new customers added this quarter compared to Q1 2020. We also had record renewals and upsells as a percentage of beginning ACV for a first quarter as we saw demand for our products continue to accelerate with companies looking to drive a digital data-driven go-to-market motion. While we continue to deliver on the near-term promise of this business, exceeding our quarterly financial guidance and raising our full-year guidance, it is the conversations I'm having with customers and prospects that makes me confident that our long-term opportunity is even bigger than what we had first envisioned. When we founded ZoomInfo, sellers and marketers desperately needed a better view of their potential customers.

84.    Defendant Hyzer similarly touted the Company's strong quarter, attributing the Company's success, in part, to the increase in customers, stating:

We saw broad-based strength across the business. And as Henry indicated, we achieved our best-ever Q1 results for new business, new customer additions, and retention activity.

This quarter was also highlighted by our successful expansion with enterprise customers, growing sales of our newer products, and strong international growth. As a result, we are raising our outlook for the year and now expect to deliver revenue growth of 41% in 2021, up from our prior guidance of 36% at the midpoint. We're also guiding to adjusted operating income in the range of $290 million to $294 million, up from our prior guidance of $280 million to $285 million. In Q1, we delivered GAAP revenue of $153 million.

This exceeded our $144 million to $146 million revenue guidance range and represents 50% year-over-year growth and 12% sequential growth as adjusted for

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 27
Case No. 3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

days in the quarter. In the first quarter, adjusted operating income was $66 million. This also exceeded our guidance range of $61 million to $63 million and represents a margin of 43%. During the first quarter, we continued to see strong new customer additions and positive momentum with respect to retention and upsell activity.

We also continued to successfully execute against the large and growing enterprise opportunity. We had strong enterprise renewals, and our enterprise upsell motion is really hitting its stride. In the quarter, we doubled the number of greater than $100,000 ACV customers added as compared to the year-ago period. As a result, as of March 31, we had more than 950 customers with $100,000 or more in ACV, up from more than 850 last quarter.

85.    During the questions and answers portion of the 1Q21 Earnings Call, when asked about whether the increase in deals with customers during the quarter was due to the pandemic, Defendant Schuck stated that:

I think we -- I think it's a pretty -- I don't think we see organizations sort of correcting for the pandemic world anymore. We think that's largely behind us. And so what we're seeing mostly is organizations trying to bring to life, especially in the enterprise, their CRM systems, their marketing automation systems, their sales automation system.

They're trying to get high ROI and real engagement out of those systems, and they view us as a strategic partner to be able to fill those systems with insights and really drive adoption and engagement from their frontline sellers and their marketing teams through those systems. And so I don't really -- I don't think anyone is focused on the pandemic mindset. Everybody is focused today on really digitizing their motion.

86.    Also on May 3, 2021, the Company filed its quarterly report for the period ended March 31, 2021 on a Form 10-Q with the SEC (the "1Q21 10-Q"). The 1Q21 10-Q contained the same information about ZoomInfo's revenue, operating income, and customers that was contained in the 1Q21 Earnings Release. *See* ¶ 80. The 1Q21 10-Q also included information on the Company's RPOs for the Company, reporting that the Company had $591.6 million in total RPOs, with $461.3 of the RPOs to be recognized within one year.

87.    The 1Q21 10-Q was signed by Defendant Hyzer and contained SOX Certifications

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 28
Case No. 3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

signed by Defendants Schuck and Hyzer, wherein they attested to the accuracy of the 1Q21 10-Q.

88.    On August 2, 2021, the Company issued a press release announcing its financial results for the second quarter of 2021 (the "2Q21 Earnings Release"). The 2Q21 Earnings Release reported that the Company's quarterly revenue was up 57% year-over-year, with revenue of $174 million for the second quarter of 2021. The 2Q21 Earnings Release also reported that ZoomInfo's operating income was $40.9 million for the quarter, an increase from the $31.2 million operating loss the Company reported for the second quarter of 2020. Additionally, the 2Q21 Earnings Release stated that the Company "closed the quarter with more than 1,100 customers with $100,000 or greater in annual contract value."

89.    On the same day, the Company held an earnings call for investors and analysts to discuss the second quarter financial results (the "2Q21 Earnings Call"). During the 2Q21 Earnings Call, Defendant Schuck stated:

> Q2 was another record quarter with accelerating revenue growth and improved operating margin performance. We continue to see positive trends across the entire business, driven by our continued investments in our sales, marketing, product, data and engineering organizations and a strong demand environment for accelerating digital transformation across go-to-market teams. This was our best ever second quarter for new customer additions, and we recorded the highest levels ever for both retention activity and customer engagement.
>
> We saw accelerating growth with our largest customers, growing the number of customers who spend more than $100,000 a year with us, by 70% year over year, ending the quarter with more than 1,100 showing meaningful traction behind the investments we've made in our enterprise motion. We're also seeing our investment in international payoff with more reps focused on the opportunity, we drove year-over-year international revenue growth greater than 75%, with international now representing 11% of our overall business. In the second quarter, we delivered GAAP revenue of $174 million, representing 57% year-over-year growth, up from 50% in Q1 and 12% sequentially when adjusted for the number of days in the quarter. Our culture of continuous improvement, defining new possible and setting the high bar is revenuing with our current and future employees.

90.    Defendant Schuck went on, stating:

BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

We had our best ever Q2 for new customer ads. We drove the highest ever levels of retention activity. And our data accuracy and coverage levels are at the highest in our history.

Our investment in customer onboarding, user experience enhancements, and integrations are improving customer satisfaction and driving the highest levels of engagement ever. International is taking off. We saw great growth across the enterprise opportunity, and we continue to develop, acquire and integrate new functionality, delivering on our vision of the modern go-to-market platform.

91.     During the questions and answers section of the 2Q21 Earnings Call, when asked about the Company's NRR trend due to the "better retention numbers and increasing deal sizes," Defendant Hyzer stated:

So we do report our net retention on an annual basis, given that it's an annual calculation kind of starting at the end of the year, going to the end of the next year. What we do look at is the retention activity that we see. So that's those customers that are renewing within a quarter and the upsells that we're generating within a quarter. And we have seen that Q2 was the best quarter we've ever had from a retention activity perspective, and I think that gives us confidence that we will see higher net retention in 2021.

And then we saw in 2020. And certainly, part of that is all of the investments that we've made in terms of our operational capabilities investing in the customer support and customer success teams, investing and improving the product, and providing additional functionality. And certainly, as we see more and more of our customers take on advanced functionality or add-on features like Engage or other things, that certainly helps the retention as well. And certainly, while a factor, I think it's a less impactful factor, but the mix shift of the business should help over time as well.

92.     Also on August 2, 2021, the Company filed its quarterly report for the period ended June 30, 2021 on a Form 10-Q with the SEC (the "2Q21 10-Q"). The 2Q21 10-Q contained the same information regarding the Company's revenue, operating income, and customers as was reported in the 2Q21 Earnings Release. *See* ¶ 88. Additionally, the 2Q21 10-Q reported that the Company's total RPOs were $648.1 million, with $505.2 million of RPOs to be recognized within one year.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 30
Case No.  3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

93.     The 2Q21 10-Q was signed by Defendant Hyzer. The 2Q21 10-Q also contained SOX Certifications signed by Defendants Schuck and Hyzer, wherein they attested to the accuracy of the 2Q21 10-Q.

94.     On August 5, 2021, the Company filed a prospectus on a Form 424B7 with the SEC in connection with the sale of 27 million shares of ZoomInfo's common stock by certain stockholders (the "August 5, 2021 Prospectus"). The August 5, 2021 Prospectus incorporated by reference the 2020 10-K, the 1Q21 10-Q, and the 2Q21 10-Q, including the materially false and misleading statements contained in ¶¶ 78, 86, and 92.

95.     On August 10, 2021, the Company again filed a prospectus on a Form 424B7 with the SEC in connection with the sale of 20 million shares of ZoomInfo's common stock by certain stockholders (the "August 10, 2021 Prospectus"). The August 10, 2021 Prospectus incorporated by reference the 2020 10-K, the 1Q21 10-Q, and the 2Q21 10-Q, including the materially false and misleading statements contained in ¶¶ 78, 86, and 92.

96.     On November 1, 2021, the Company issued a press release announcing its financial results for the third quarter of 2021 (the "3Q21 Earnings Release"). In the 3Q21 Earnings Release, the Company reported that its quarterly revenue was up 60% year-over-year, with revenue of $197.6 million for the third quarter of 2021. The Company also reported that its quarterly operating income was up 10% year-over-year, with operating income of $20.2 million for the quarter. Additionally, the 3Q21 Earnings Release reported an increase in customers, stating that the Company "[c]losed the quarter with more than 25,000 customers, and more than 1,250 customers with $100,000 or greater in annual contract value."

97.     In the 3Q21 Earnings Release, Defendant Shuck touted the Company's success, stating that the Company delivered "exceptional results" during the quarter.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 31
Case No.  3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

98.     On the same day, the Company held an earnings call for investors and analysts to discuss the financial results for the third quarter of 2021 (the "3Q21 Earnings Call"). During the 3Q21 Earnings Call, Defendant Schuck touted the Company's increased customer base, stating, in relevant part:

> In Q3, we delivered another quarter of accelerating growth with both strong operating margins and strong free cash flow generation. The team is executing well across every area of the business. . . .
>
> *This was our best ever third quarter for new customer addition. And the leading indicators are pointing to meaningfully higher annual net dollar retention rates with expected improvements across customers of all sizes.*
>
> In the quarter, we delivered GAAP revenue of $198 million, representing 60% year-over-year growth, up from 57% in Q2 and up 12% sequentially when adjusted for the number of days in the quarter. We delivered unlevered free cash flow of $73 million, up 23% year over year. *We closed the quarter with more than 25,000 customers, of which more than 1,250 customers have greater than $100,000 in ACV. The number of customers with more than $100,000 in ACV grew more than 70% year over year.*

(Emphasis added).

99.     Defendant Schuck continued to discuss customer growth during the 3Q21 Earnings Call, stating:

> In the third quarter alone, saw 25% sequential growth in this level of automation from our customers through increased adoption of our workflow functionality. During the quarter, we surpassed 25,000 customers, and we now have more than 1,250 customers with greater than 100,000 in ACV. These customers now represent more than 40% of our overall ACV with the ACV from not cohort growing by more than 85% year over year. Growth is coming both from expansions of existing customers and landing new customers above the 100,000 threshold, with customers taking up more and more products at the point of initial sale.

100.    During the 3Q21 Earnings Call, when asked about what was driving the increase in customers with $100,000 or more ACV, Defendant Schuck stated:

> I think we see growth in both of those cities. We see growth from a user and seat expansion across the enterprise. And that just fits into our land and expand motion

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 32
Case No.  3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

where we can land in one sort of business unit of an enterprise customer and then expand as that business unit see success.

And then, the other is, we are selling an expanding product set into the enterprise. And so, where we may land with the intelligence layer, we end up selling the engagement layer in or we sell our chat functionality, our engage functionality, the Chorus functionality. We sell our DAS offering, which is an outgrowth of our EverString acquisition last year into the enterprise in an accelerated fashion. And so, you really see growth in that enterprise cohort coming from both new products that we're able to cross-sell in, as well as new user seats and expansion within that customer base.

101.    Also on November 1, 2021, the Company filed its quarterly report for the period ended September 30, 2021 with the SEC (the "3Q21 10-Q"). The 3Q21 10-Q contained the same information regarding the Company's revenue, operating income, and customers as was reported in the 3Q21 Earnings Release. *See* ¶ 96. Additionally, the 3Q21 10-Q included information on the Company's RPOs, reporting that the Company had total RPOs of $712.3 million, with $552.2 million of RPOs to be recognized within one year.

102.    The 3Q21 10-Q was signed by Defendant Hyzer and was accompanied by SOX Certifications signed by Defendants Schuck and Hyzer, wherein they attested to the accuracy of the 3Q21 10-Q.

103.    On February 15, 2022, the Company issued a press release announcing its financial results for the fourth quarter and full year of 2021 (the "4Q21 Earnings Release"). The 4Q21 Earnings Release reported that the Company's quarterly revenue was up 59% year-over-year, with revenue of $222.3 million for the fourth quarter of 2021. The 4Q21 Earnings Release also reported that the Company had quarterly operating income of $24.2 million. Additionally, the 4Q21 Earnings Release reported that the Company had revenue of $747.2 million for 2021, an increase of 57% year-over-year. The 4Q21 Earnings Release highlighted that the Company closed the quarter with 1,452 customers with $100,000 or greater in ACV. Defendant Schuck was quoted in

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 33
Case No. 3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

the 4Q21 Earnings Release as stating "[i]n 2021 we delivered a leading combination of growth and profitability, significantly expanded our platform, added more new customers than ever before, and drove record customer retention."

104.    That same day, the Company held an earnings call for analysts and investors to discuss the financial results for the fourth quarter of 2021 (the "4Q21 Earnings Call"). During the 4Q21 Earnings Call, Defendant Schuck touted the Company's increase in customers, stating, in relevant part:

> We are delivering a leading combination of growth, profitability and free cash flow generation at scale. We closed the quarter with 1,452 customers with greater than $100,000 in ACV, up 70% year over year, while adding more new customers to the overall business than any other quarter in our history. Growth across our newly introduced products was strong as well, with Chorus and RingLead leading the way. At the time of acquisition, our conversation intelligence platform, Chorus, was growing 100% year over year, and we accelerated that growth in both the third and fourth quarters of 2021.

105.    Defendant Schuck ended his remarks in the 4Q21 Earnings Call by stating, "[W]e drove record customer additions and record retention rates in 2021. Looking forward, we're excited about the continued strong demand environment that sets the stage for our continued growth and profitability as we extend our leadership position in a more than $70 billion market opportunity."

106.    Defendant Hyzer similarly touted the Company's increase in customers, specifically noting the Company's increase in NRR, stating, in relevant part:

> This year, we significantly expanded our offering by developing an application layer on top of our best-in-class data assets and acquiring and quickly integrating chat conversation intelligence and orchestration technology into the platform. These innovations enabled us to add more new customers than ever before and drove increasing levels of sales to existing customers and record net revenue retention of 116%, up from 108% in 2020. In the fourth quarter, we delivered GAAP revenue of $222 million, a year-over-year growth of [Audio gap] growth of 13% when adjusted for the number of days in the quarter. For the full year, we delivered GAAP revenue of $747 million, up 57% on the year, organic growth greater than 50%, operating income margin of 41% and unlevered free cash flow

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 34
Case No.  3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

of $347 million, up 42% year over year and quickly approaching more than $1 per share in free cash flow.

We are delivering a leading combination of growth, profitability and free cash flow generation at scale. We closed the quarter with 1,452 customers with greater than $100,000 in ACV, up 70% year over year, while adding more new customers to the overall business than any other quarter in our history.

107.    During the questions and answers section of the 4Q21 Earnings Call, when asked about the Company's momentum going into 2022, Defendant Schuck assured investors that the Company's growth would continue, stating:

**We have built a stronger enterprise pipeline than we've ever had in the history of our business**. And that's coming from a number of different ways. I think first, the natural tailwind in the enterprise is they continue to modernize their go-to-market systems and they continue to leverage digital technologies to go to market is a very clear continued tailwind. But I think the second thing that we're seeing is that the platform story is really resonating.

I talked to an enterprise customer in Q4 who was using 12 different vendors to accomplish what they could do with just one ZoomInfo subscription. And that story [Inaudible] best-in-class products, across that platform suite, I think we're going to continue to take market share and continue to expand in the enterprise. We've hired a great team [Inaudible] that run our enterprise sales that we feel really strongly about. **And so we continue to build a really great pipeline within the enterprise.**

**And I would describe it as more demand within the enterprise than we've seen in our history.**

(Emphasis added).

108.    Also during the questions and answers section, Defendant Schuck reassured investors that the growth experienced in 2021, specifically in regards to the NRR, would continue, stating, in relevant part, "[s]o we're really excited about what we've been able to do with our net revenue retention . . . . I do think that the rates we established in 2021 are sustainable and something that we'll look to improve upon as we look into next year and the following years."

109.    When asked whether the COVID-19 pandemic resulted in the "pull-forward in

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 35
Case No. 3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

direct selling" during the 4Q21 Earnings Call, Defendant Shuck assured the analyst that the

pandemic was not the reason for the Company's growth, stating:

> I have not had a single enterprise call with a single enterprise customer where there
> isn't double-digit expansion opportunity within those accounts from a SalesOS
> perspective. They're just -- we still continue to be really early in our penetration
> across the enterprise. And so we continue to make headway there, but it's still really,
> really early and lots and lots of opportunity in the core SalesOS motion.

> I'll tell you, we're constantly looking at the data, the historical data. We look at win
> rates, funnel conversion, top of funnel activity. ***And we spent a real amount of time
> looking for anomalies that we could tie back to some relation to COVID. And we
> didn't see anything that would [Audio gap] believe that the current strong
> demand trends we're seeing wouldn't continue or were one-off or a pull forward.***

> ***And we wanted to be confident about that because it would affect the way we
> operate the business. We didn't see any anomalies like that, that made us think
> that COVID caused a pull-forward and the demand environment that we're
> seeing today wouldn't continue.***

(Emphasis added).

110.    Shortly thereafter, on February 24, 2022, the Company filed its annual report for

2021 on a Form 10-K with the SEC (the "2021 10-K"). The 2021 10-K included the same

information regarding the Company's revenue, operating income, customers, and NRR reported

in the 4Q21 Earnings Release. *See* ¶ 103. Additionally, the 2021 10-K reported that the Company

had total RPOs of $864.4 million, with $671.5 of RPOs to be recognized within one year.

111.    The 2021 10-K was signed by Defendants Schuck, Crockett, Dhruv, Enright,

Evans, Mader, McCarter, Winn, and Hyzer. The 2021 10-K was also accompanied by SOX

Certifications signed by Defendants Schuck and Hyzer, wherein they attested to the accuracy of

the 2021 10-K.

112.    On March 29, 2022, the Company filed its annual proxy statement on a Schedule

14A with the SEC (the "2022 Proxy"). In a section titled "Oversight of Risk Management," the

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 36
Case No.  3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

2022 Proxy stated:

> The Board has extensive involvement in the oversight of risk management related to us and our business. The Board accomplishes this oversight both directly, including as it relates to ESG risk exposures, and through its Audit Committee, Compensation Committee, Nominating and Corporate Governance Committee, and Privacy, Security and Technology Committee, each of which assists the Board in overseeing a part of our overall risk management and regularly reports to the Board. The Audit Committee represents the Board by periodically reviewing our accounting, reporting and financial practices, including the integrity of our financial statements, the oversight of administrative and financial controls, our compliance with legal and regulatory requirements and our policies with respect to risk assessment and risk management. Through its regular meetings with management, including the finance, legal and internal audit functions, the Audit Committee reviews and discusses significant areas of our business and related risks and summarizes for the Board areas of risk and any mitigating factors. The Compensation Committee considers, and discusses with management, management's assessment of certain risks, including whether any risks arising from our compensation policies and practices for our employees are reasonably likely to have a material adverse effect on us. The Nominating and Corporate Governance Committee oversees and evaluates programs and risks associated with Board organization, membership and structure, succession planning and corporate governance. In addition, our Board receives periodic detailed operating performance reviews from management. The Privacy, Security and Technology Committee, represents the Board by periodically reviewing and discussing with Company management the Company's major risk exposures relating to privacy, cybersecurity, and technology, and the steps the Company takes to detect, monitor, and actively manage such exposures.

113.    Defendants Schuck, Enright, Evans, Mader, and Winn each solicited the 2022 Proxy.

114.    On May 2, 2022, the Company issued a press release announcing its financial results for its first quarter of 2022 ("1Q22 Earnings Release"). The 1Q22 Earnings Release stated that ZoomInfo's quarterly revenues increased 58% year-over-year to $241.7 million, and ZoomInfo's quarterly operating income increased 16% year-over-year to $32.4 million. The 1Q22 Earnings Release also reported that the Company closed the quarter with 1,623 customers with $100,000 or greater in ACV.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 37
Case No.  3:25-cv-05088

1    115.    On the same day, the Company held an earnings call for investors and analysts to

2 discuss the financial results for the first quarter of 2022 (the "1Q22 Earnings Call"). Defendant

3 Schuck began the 1Q22 Earnings Call by highlighting the Company's growth in customers, stating,

4 in relevant part:

> We are increasingly seeing customers embrace the integrated platform experience.
> running more and more of their sales stack on ZoomInfo. In the quarter, we drove
> a more than 100% increase in customers using the combined Sales S platform,
> Engage, and Chorus offering, reinforcing the value of an integrated solution. In the
> first quarter, we delivered GAAP revenue of $242 million, year-over-year growth
> of 58%, and sequential quarterly growth of 11% when adjusted for the number of
> days in the quarter.
>
> Adjusted operating income margin was 39%, and we generated $126 million in free
> cash flow. We continued to deliver a leading combination of growth, profitability,
> and free cash flow generation at scale. We closed the quarter with 1,623 customers
> with greater than $100,000 in ACV, up more than 65% year over year, while the
> average revenue across these customers continues to grow. And we saw incredibly
> strong growth in new business as the new customer team had their best Q1 ever on
> an ACV basis and the best quarter ever on a TCV basis. . . .
>
> We continue to see solid traction with our enterprise clients.

14    116.    Defendant Hyzer also credited the Company's success to its customer base, stating,

15 in relevant part:

> Q1 was another terrific quarter in terms of execution and growth. We outperformed
> all areas of our guidance and executed well across our portfolio of growth
> initiatives, including enterprise, international, and emerging advanced functionality
> on the platform. The demand environment remains strong.
>
> Companies continue to invest behind improving their go-to-market motions and the
> platform strategy is resonating with customers. We are confident that given the
> tremendous value we provide to our customers our current narrow level of market
> penetration that we will be able to drive durable growth regardless of the economic
> environment. . . .
>
> This is reflected in the addition of more than 150 customers with more than
> $100,000 in ACV and further penetration of our recently expanded marketing OS
> and talent OS offerings. Turning to the balance sheet and cash flow. We ended the
> first quarter with $407 million in cash, cash equivalents, and short-term

24   VERIFIED SHAREHOLDER DERIVATIVE
     COMPLAINT - 38
     Case No. 3:25-cv-05088

BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

investments. Operating cash flow in Q1 was $105 million, which included approximately $20 million of interest payments.

117.    During the question and answers section of the 1Q22 Earnings Call, when asked about customers with more than $100,000 in ACV, Defendant Hyzer stated:

> You cut out just a little in the middle there. But I think your question was that for those customers that we added that are over 100,000, how much of that is existing customers that are upselling versus customers that are coming on and buying a number of different parts of the platform. As has been historically the case, we tend to land customers with a kind of smaller offering or sometimes a trial and then expand and grow them over time.
>
> So that continues to be the case that we've that most of the customers that we add in that 100,000 are customers that started at a smaller level with us and we've upsell. But there does continue to be momentum in customers coming on over 100,000. Yep. I think last year, we started to see a little bit more momentum, and that's continued in Q1, where a growing number of customers are coming in at 200,000 or 500,000 and then continuing to grow from there as well.

118.    Also on May 2, 2022, the Company filed its quarterly report for the period ended March 31, 2022 on a Form 10-Q with the SEC (the "1Q22 10-Q"). The 1Q22 10-Q included the same information regarding the Company's revenue, operating income, and customers as was reported in the 1Q22 Earnings Release. *See* ¶ 114. The 1Q22 10-Q also reported that the Company had total RPOs of $917.6 million, with $715 million of RPOs to be recognized within one year.

119.    The 1Q22 10-Q was signed by Defendant Hyzer and was accompanied by SOX Certifications executed by Defendants Schuck and Hyzer, wherein they attested to the accuracy of the 1Q22 10-Q.

120.    On August 1, 2022, the Company issued a press release announcing its financial results for the second quarter of 2022 (the "2Q22 Earnings Release"). The 2Q22 Earnings Release reported that the Company's quarterly revenue increased 54% year-over-year to $267.1 million. The 2Q22 Earnings Release also reported that the Company's quarterly operating income was

BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

1   $39.5 million, a decrease from the same quarter in 2021. Additionally, the 2Q22 Release also

2   stated that ZoomInfo closed the quarter with more than 30,000 customers, 1,763 of which had

3   $100,000 or more in ACV.

4       121.    On the same day, the Company held an earnings call with investors and analysts to

5   discuss the Company's financial results for the second quarter of 2022 (the "2Q22 Earnings Call").

6   During the 2Q22 Earnings Call, Defendant Schuck began his remarks by stating, in relevant part:

> In short, we are executing well and demand remains strong. We also continue to monitor the economic environment and look for signs of impact on our business. We listen to Chorus calls, we speak with our sales reps, and we hear directly from our customers. We have seen sales cycles that are somewhat extended relative to sales cycles in Q1, driven by incremental finance and procurement review, but deals are still closing.
>
> While a more uncertain macroeconomic environment may create some elongating near-term sales cycles, our very efficient go-to-market motion and proven quick time to value for our customers will help insulate us. The market opportunity is huge, and we are executing against it. We are in the earliest days of what we believe is a generational transformation of how businesses go to market with data, insights and a purpose-built software platform, a transformation that we are uniquely positioned to lead. We have the right platform, the integrated data and insights that power that platform, and we are delivering success to our customers as they look for efficiencies and look to consolidate with fewer and fewer strategic vendors.
>
> We continue to deliver success to customers of all sizes across all industries with customers increasingly choosing ZoomInfo as a pillar of their go-to-market tech stack. As companies focus on efficiency, profitability and unit economics, the most obvious path is to get more out of your existing sales and marketing resources. For two decades, we have been a trusted partner to deliver just that.

        122.    During the questions and answers section of the 2Q22 Earnings Call, when asked

whether there were any changes to gross retention in specific customer segments, Defendant Hyzer

assured investors that the Company was confident in its ability to deliver growth, stating:

> So there isn't anything worth calling out in terms of specific segments or anything else. I do think, as we look forward, macroeconomic headwinds could create some pressure with respect to net retention, but we're still seeing our customers continue to want to invest into really enabling and creating a better environment for their

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

sellers. So I think what we're seeing today gives us even more confidence in our ability to drive toward that $2 billion run rate revenue target that we've set for ourselves and continue to see retention over the long term continue to improve.

123.    Also during the 2Q22 Earnings Call, Defendant Schuck, in response to a question from an analyst, alleged that the Company was still in the early stages of its growth, stating:

I think just from a penetration perspective, we still feel like we're in very, very early innings. I get asked often what happens if sales hiring slows in these accounts. Are you limited by your ability to add user seats? On the vast majority, the overwhelming majority of the accounts that we operate inside of, we're not wall-to-wall across the sales team.

And so we have this tremendous growth opportunity within sales organizations that we're executing against. And so we still feel like we're in the incredible early innings of the opportunity. And so we don't feel special exposure across any industry or any customer side segment.

124.    Defendant Hyzer made similar statements about the Company's opportunity for growth during the 2Q22 Earnings Call, stating, in relevant part:

So I think consistent with what we've seen historically and continue to see in -- throughout the year, new sales continues to be a really strong driver of growth, and it's more than half of the growth that we see. I think that we're in such early innings in terms of the penetration of the overall market. Ultimately, every business that's selling to another business can and should use ZoomInfo to do a better job of that.

And we have customers 30,000 today. There are over 700 potential customers that we can go out and get. So we have a lot of excitement about our ability to go out and continue to bring on new customers and help them be successful. At the same time, within our existing customers, I think the consolidation play is an important lever that we can continue to use.

But there's also a tremendous amount of white space expansion within those customers. Whether it's adding on new users to go wall-to-wall, whether it's helping their data teams really get to higher-quality data or, honestly, a lot of the advanced functionality that we offer is still relatively nascent out in the market. And there are a number of large enterprise customers where we can double, triple, quadruple the amount of revenue that we're getting in a white space way as opposed to consolidating other spend that's out there. And I think in a challenging macroeconomic environment, that replacement might be the easiest thing for us.

But over the long term, there's a lot more opportunity for the white space

1    opportunity within our existing customers as well.

2    125.    Also on August 1, 2022, the Company filed its quarterly report for the period ended

3    June 30, 2022 on a Form 10-Q with the SEC (the "2Q22 10-Q"). The 2Q22 10-Q contained the

4    same information regarding the Company's revenue, operating income, and customers as was

5    reported in the 2Q22 Earnings Release. *See* ¶ 20. The 2Q22 10-Q also reported that the Company

6    had total RPOs of $984.7 million, with $764.2 million of RPOs to be recognized within one year.

7    126.    The statements contained in ¶¶ 65-125 were materially false and misleading

8    because they failed to disclose, *inter alia*, that: (a) the COVID-19 pandemic had temporarily

9    inflated the use of the Company's platform; (b) the increase in the Company's customers and

10   business was only temporary due to the pandemic; (c) in order to retain the diminishing customer

11   base, the Company instituted deceptive and coercive auto-renewal policies; (d) as a result, the

12   Company's reported revenues, operating income, and customer and retention metrics were

13   materially overstated; (e) the Company failed to maintain adequate oversight and internal controls

14   over its financial reporting; and (f) as a result of the foregoing, positive statements regarding the

15   Company's business, operations, and prospects were materially false and misleading and lacked a

16   reasonable basis at all relevant times.

17   127.    On November 1, 2022, the Company hosted an earnings call for investors and

18   analysts to discuss the financial results for the third quarter of 2022 (the "3Q22 Earnings Call").

19   During the 3Q22 Earnings Call, it was revealed for the first time that the Company's customer

20   base was not as strong as the Company had led on. During the 3Q22 Earnings Call, Defendant

21   Hyzer revealed that the Company was experiencing a greater level of scrutiny from customers,

22   which would cause the Company to "retrace" its NRR in 2022, stating:

23   While we are more insulated from macro challenges relative to many companies

24   VERIFIED SHAREHOLDER DERIVATIVE
     COMPLAINT - 42
     Case No. 3:25-cv-05088

and we benefit from long-term secular trends toward digitization, we are not immune to the macroeconomic environment in the short term. Towards the end of Q3 and as we entered Q4, we saw a greater level of financial scrutiny from buyers, which further elongated sales cycles. All deals, including straight renewals are requiring more effort to reach an outcome, which stretches our sales team and capacity. As reps are spending more time on renewals, we see that their capacity to drive incremental upsells is becoming a limiting factor to growth of existing customers.

As a result of the more challenging environment, we now expect dollar-based net retention in 2022 to retrace the gains that we were able to achieve in 2021. In short, we are taking a prudent view of the near-term growth expectations for Q4 and 2023 until we see more definitive signs that the economic environment is improving. That said, we are still raising our guidance for the year and are confident in the value proposition that we deliver to our customers. For 2022, we now expect revenue to be in the range of $1.094 billion to $1.096 billion.

128.    Defendant Hyzer also reported on the Company's RPOs, stating "[w]ith respect to liabilities and future performance obligations, unearned revenue at the end of the quarter was $381 million and remaining performance obligations, or RPO, were $979 million, of which $757 million are expected to be delivered in the next 12 months." This was a decrease from the RPOs reported in the 2Q22 10-Q.

129.    Despite this seemingly negative information revealed in the 3Q22 Earnings Call, which caused the Company's common stock to drop $12.69 per share, or approximately 29%, on November 2, 2022, the Company continued to downplay its issues with customer retention and contracts.

130.    Indeed, on the same day, November 1, 2022, the Company issued a press release announcing its financial results for the third quarter of 2022 (the "3Q22 Earnings Release"). The 3Q22 Earnings Release reported that the Company's quarterly revenue was up 46% year-over-year to $287.6 million, and that its quarterly operating income was up 156% year-over-year to $51.8 million. The 3Q22 Earnings Release also reported that the Company closed the quarter with

BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

1,848 customers with $100,000 or greater in ACV. Defendant Schuck was quoted in the 3Q22

Earnings Release as saying that the Company "delivered another quarter of record revenue and

profitability" and that customers were "looking to [the Company] for best practices on how to

grow efficiently."

131.    Furthermore, during the 3Q22 Earnings Call, Defendant Schuck reported that the

Company's gross retention rates "stayed largely the same." Defendant Hyzer also stated, in

relevant part:

> What we are seeing is that gross retention continues to be really strong, over 90%.

> So we still have customers that are renewing, and we have seen an acceleration in
> terms of functionality upsells. Where we're seeing more pressure is with respect to
> the seat expansions and data expansions that we had seen historically. That's the
> area where we feel our team isn't able to go after as much of the upsell opportunity
> given the incremental time that they're spending on renewals and deals in general.

132.    In response to a question from an analyst regarding changes in "gross churn" across

different market segments, Defendant Hyzer stated:

> Gross churn. So gross churn actually hung in very well despite the macroeconomic
> environment. So when people were using ZoomInfo, they're continuing to renew
> the gross churn rate or gross retention continues to be well over 90%. So I think
> that we feel really good about that.

> The change in the NRR aspect has much more to do with those seat-based
> expansion opportunities that our team is spending more time getting those renewals
> just based on greater scrutiny that's being applied by our customers, and therefore,
> is getting less opportunities to go out and really push those upsells that we've seen
> historically.

133.    Also during the 3Q22 Earnings Call, when asked what would calm customers

nerves or instill more confidence in customers, Defendant Schuck assured investors that customers

were continuing to invest in the Company, stating, in relevant part:

> I don't know if they're waiting on a macro indicator more than their -- they are
> experiencing similar levels of additional scrutiny and executive reviews in their

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 44
Case No.  3:25-cv-05088

own businesses. And I think, what they're looking for is the change in that environment. What I will tell you is the largest new business deal and the largest expansion deal in our history, those customers are coming to us and saying, listen, I'm going to forego the next three or four headcount from a sales perspective.

And I'm going to use those dollars to invest in ZoomInfo and make the entire additional team more productive, more efficient and more effective. We hear that over and over again. And so, I think that thinking around how do I make the rest of my team more efficient? How do I make everybody more efficient is starting to materialize throughout our customer base and throughout our new business prospects. Where the historical view of how do I grow has been, I just need to add another headcount, another five headcount, another 10 headcount.

I think, teams across the world are saying, how do I grow without adding headcount? How do I make all of my team more efficient and more productive? And that's the message that we're trying to land with our customer base as well.

134.    The Company also filed its quarterly report for the period ended September 30, 2022 on a Form 10-Q with the SEC on November 1, 2022 (the "3Q22 10-Q"). The 3Q22 10-Q contained the same information regarding the Company's revenue, operating income, and customers as was reported in the Q322 Earnings Release. *See* ¶ 130. The 3Q22 10-Q also contained the same information on the Company's RPOs as was revealed during the 3Q22 Earnings Call.

135.    The 3Q22 10-Q was signed by Defendant Hyzer and was accompanied by SOX Certifications signed by Defendants Schuck and Hyzer, wherein they attested to the accuracy of the 3Q22 10-Q.

136.    The statements contained in ¶¶ 130-134 were materially false and misleading because they failed to disclose, *inter alia*, that: (a) the COVID-19 pandemic had temporarily inflated the use of the Company's platform; (b) the increase in the Company's customers and business was only temporary due to the pandemic; (c) in order to retain the diminishing customer base, the Company instituted deceptive and coercive auto-renewal policies; (d) as a result, the Company's reported revenues, operating income, and customer and retention metrics were

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 45
Case No.  3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

materially overstated; (e) the Company failed to maintain adequate oversight and internal controls over its financial reporting; and (f) as a result of the foregoing, positive statements regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

137.    That same month, on November 16, 2022, Defendant Hyzer participated in an investor conference hosted by RBC Capital Markets, wherein Defendant Hyzer revealed that the Company was experiencing customer scrutiny during the contract renewal process, which would negatively impact the Company's ability to grow its revenues during 2023.

138.    On this news, the Company's stock price dropped $5.52 per share over the course of two days, or approximately 17%, to close at $26.17 per share on November 17, 2022.

139.    However, despite this, the Company continued to downplay the severity of the issues the Company was experiencing with its customer base.

140.    For instance, on February 6, 2023, the Company issued a press release announcing its financial results for the fourth quarter and full year of 2022 (the "4Q22 Earnings Release"). The 4Q22 Earnings Release reported that ZoomInfo's quarterly revenue increased 36% year-over-year to $301.7 million, and that ZoomInfo's quarterly operating income increased 115% year-over-year to $52.1 million. The 4Q22 Earnings Release also stated that the Company closed the quarter with 1,926 customers with $100,000 or greater in ACV. Furthermore, the 4Q22 Earnings Release reported that the Company's NRR for 2022 was 104%.

141.    Defendant Schuck was quoted in the 4Q22 Earnings Release as stating, "[o]ur results once again demonstrate our continued value proposition, as we drive an efficient go-to-market motion for our customers, with a quick-time-to-value and tangible long-term ROI. We are well-positioned to be a durable grower while compounding free cash flow over the long-term."

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

142.     On the same day, the Company held an earnings call for investors and analysts to discuss the Company's financial results for the fourth quarter of 2022 (the "4Q22 Earnings Call"). During the 4Q22 Earnings Call, when asked whether the Company reached "peak uncertainty" for the demand environment, Defendant Schuck assured investors that the Company was well-positioned in the market, stating:

> Look, there hasn't been any material change in buyer behavior that we're seeing out in the market as it relates to uncertainty or the macroeconomic environment. So, we haven't seen any change in that. What I'll tell you from a demand and pipeline generation perspective, January, we saw our largest pipeline we've ever generated. We're generating more MQLs than we've had in our history.

> When buyers are buying, they're buying decisively and at strong ASPs, and we're seeing less competition in our deals in Q4. And where we do see competition, primarily in the SMB segment of our business, we're seeing the highest in-month win rate ever for a nonend of the quarter month. And so, all of that tells me that, while there is room for improvement from an execution perspective, it really is customers' uncertainty about the broader economic environment that's holding us back from delivering more top-line growth. So, as the uncertainty fades, I'm confident that we'll be in a great position to accelerate out.

> We haven't seen that fading yet.

143.     Additionally, during the 4Q22 Earnings Call, Defendant Schuck defended the strength of the Company's customer base, stating, in relevant part:

> I think the big thing that we know today is that there is a real growth opportunity within our enterprise customer base. Today, we have 35,000 customers, and we're driving real growth across our enterprise customers. But when we look within the enterprise, we think we can significantly accelerate that. And so, bringing in a chief revenue officer who has a ton of experience within the enterprise, this felt like the right time to do it.

> We see that segment as the biggest growth opportunity, and we wanted to bring somebody in who had significant experience in that land and expand motion and especially across the enterprise.

144.     Defendants Hyzer and Schuck both represented that the Company's pipeline was strong, with Defendant Hyzer stating that the Company had "more pipeline" than ever before, and

Defendant Schuck stating the following:

> I would add that our pipeline in January was the strongest it's ever been. We generated more MQLs than we ever have in our history. So, there's real demand out there in the market for our products. But, ultimately, what we're ending up seeing is customers are waiting.
>
> They're not making purchase decisions at the level -- the velocity levels as they were a year ago. But there is real demand out there. We're generating it. We're generating that pipeline.
>
> And so, we'll continue to do that and feel like as the uncertainty phase will be in a really great position to accelerate through that.

145.    Shortly thereafter, on February 16, 2023, the Company filed its annual report for 2022 on a Form 10-K with the SEC (the "2022 10-K"). The 2022 10-K contained the same information regarding the Company's revenue, operating income, customers, and NRR as was reported in the 4Q22 Earnings Release. *See* ¶ 140. The 2022 10-K also reported that the Company had total RPOs of $1.106 billion, with $842.2 million of the RPOs to be recognized within one year. Furthermore, the 2022 10-K reported that the Company had $222.9 million in accounts receivable for the year.

146.    In addition, the 2022 10-K, under the section titled "Concentrations of Credit Risk and Significant Customers," stated, in relevant part, "[w]e maintain an allowance for credit losses based upon the expected collectability of accounts receivable. The Company performs ongoing credit evaluations of its customers and maintains allowances for possible losses, which, when realized, have been within the range of management's expectations."

147.    The 2022 10-K also stated, under the section titled "Accounts Receivable and Contract Assets," in relevant part:

> Accounts receivable is comprised of invoices of revenue, net of allowance for credit losses, and does not bear interest. We consider receivables past due based on the contractual payment terms. Management's evaluation of the adequacy of the

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 48
Case No.  3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

allowance for credit losses considers historical collection experience, changes in customer payment profiles, the aging of receivable balances, as well as current economic conditions, all of which may impact a customer's ability to pay. Account balances are written-off against the allowance after all means of collection have been exhausted and the potential for recovery is considered remote. ***The Company does not have significant bad debt experience with customers, and therefore, the allowance for credit losses is immaterial as of December 31, 2022 and December 31, 2021.***

(Emphasis added).

148.    The 2022 10-K was signed by Defendants Schuck, Crockett, Dhruv, Enright, Evans, Gleeson, Mader, McCarter, Winn, and Hyzer. The 2022 10-K was also accompanied by SOX Certifications signed by Defendants Schuck and Hyzer, wherein they attested to the accuracy of the 2022 10-K.

149.    On March 29, 2023, the Company filed its annual proxy statement on a Schedule 14A with the SEC (the "2023 Proxy"). In a section titled "Oversight of Risk Management," the 2023 Proxy stated:

The Board has extensive involvement in the oversight of risk management related to us and our business. The Board accomplishes this oversight both directly and through its Audit Committee, Compensation Committee, Nominating and Corporate Governance Committee, and Privacy, Security and Technology Committee, each of which assists the Board in overseeing a part of our overall risk management and regularly reports to the Board. The Audit Committee represents the Board by periodically reviewing our accounting, reporting and financial practices, including the integrity of our financial statements, the oversight of administrative and financial controls, our compliance with legal and regulatory requirements and our policies with respect to risk assessment and risk management. Through its regular meetings with management, including the finance, legal and internal audit functions, the Audit Committee reviews and discusses significant areas of our business and related risks and summarizes for the Board areas of risk and any mitigating factors. The Compensation Committee considers, and discusses with management, management's assessment of certain risks, including whether any risks arising from our compensation policies and practices for our employees are reasonably likely to have a material adverse effect on us. The Nominating and Corporate Governance Committee oversees and evaluates programs and risks associated with Board organization, membership and structure, succession planning and corporate governance. In addition, our Board receives periodic detailed

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 49
Case No. 3:25-cv-05088

BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

operating performance reviews from management. The Privacy, Security and Technology Committee, represents the Board by periodically reviewing and discussing with Company management the Company's major risk exposures relating to privacy, cybersecurity, and technology, and the steps the Company takes to detect, monitor, and actively manage such exposures.

150.    Defendants Schuck, Enright, Evans, Mader, and Winn each solicited the 2023 Proxy.

151.    On May 1, 2023, the Company issued a press release announcing its financial results for its first quarter of 2023 ("1Q23 Earnings Release"). The 1Q23 Earnings Release reported that ZoomInfo's quarterly revenue increased 24% year-over-year to $300.7 million, and that ZoomInfo's quarterly operating income was up 105% year-over-year to $66.3 million. The 1Q23 Earnings Release also reported that the Company closed the quarter with 1,905 customers with $100,000 or greater in ACV.

152.    On the same day, the Company held an earnings call for investors and analysts to discuss the Company's financial results for the first quarter of 2023 (the "1Q23 Earnings Call"). During the 1Q23 Earnings Call, in response to an analyst question regarding sales trends, Defendant Hyzer stated, in relevant part:

> Yeah, so in terms of linearity, specifically April was better than January. Typically, we do have some level of linearity within the month. So, you know the first month is oftentimes a little less than the second month, which has been less than the third month. ***But we do feel that momentum and on a, you know, adjusted basis comparing it to January, gives us, you know, confidence in where Q2 is going.***
>
> And, you know, certainly from a – and that's actual sales, closed sales. From a pipeline perspective, I think we're seeing a similar dynamic of improvement in Q2.

(Emphasis added).

153.    Also in the 1Q23 Earnings Call, when asked about the timeline for a new normal sales cycle, Defendant Schuck stated, in relevant part, "[a]nd as far as the sales cycles coming back

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 50
Case No.  3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

1    to a more normal state, what I'll say is I'll reiterate what Cameron said, which is April, as compared

2    to January, is off to a much better start than January was."

3        154.    Defendant Hyzer also touted the Company's future growth, stating, when asked

4    about how the Company can get to accelerating revenue growth in the second half of 2023:

> As we look forward and we develop our, you know, guidance and assumptions, we are focusing on what does the, you know, shape of expirations and renewals look like, as well as what our sales capacity, you know, looks like in terms of the new sales and upsell possibilities. And so, with added sales capacity and the shape of expirations that start to get us a little bit more support as we're going forward, that gives us good confidence in our ability to see that accelerating sequential revenue growth in order to hit the guidance. And certainly, where we have, you know, obviously, very good visibility into Q2, we're already seeing that in April compared to January as well.

10       155.    Also on May 1, 2023, the Company filed its quarterly report for the period ended

11   March 31, 2023 on a Form 10-Q with the SEC (the "1Q23 10-Q"). The 1Q23 10-Q contained the

12   same information regarding the Company's revenue, operating income, and customers as was

13   reported in the 1Q23 Earnings Release. *See* ¶ 151. The 1Q23 10-Q also reported that the Company

14   had $1.092 billion in total RPOs, with $839.2 of the RPOs to be recognized within one year.

15       156.    The 1Q23 10-Q also highlighted the Company's accounts receivables, reporting

16   that the Company ended the quarter with $215.5 million in accounts receivable, and stating the

17   following in a section titled "Concentrations of Credit Risks and Significant Customers": "We

18   maintain an allowance for credit losses based upon the expected collectability of accounts

19   receivable. The Company performs ongoing credit evaluations of its customers and maintains

20   allowances for possible losses, which, when realized, have been within the range of management's

21   expectations."

22       157.    In a section titled "Accounts Receivable and Contract Assets," the 1Q23 10-Q went

23   on to state, in relevant part:

24   VERIFIED SHAREHOLDER DERIVATIVE
     COMPLAINT - 51
     Case No.  3:25-cv-05088

1

Accounts receivable is comprised of invoices of revenue, net of allowance for credit
losses, and does not bear interest. We consider receivables past due based on the
contractual payment terms. Management's evaluation of the adequacy of the
allowance for credit losses considers historical collection experience, changes in
customer payment profiles, the aging of receivable balances, as well as current
economic conditions, all of which may impact a customer's ability to pay. Account
balances are written-off against the allowance after all means of collection have
been exhausted and the potential for recovery is considered remote. ***The Company
does not have significant bad debt experience with customers, and therefore, the
allowance for credit losses is immaterial as of March 31, 2023 and December 31,
2022.***

2

3

4

5

6

7

(Emphasis added).

8

158.    The 1Q23 10-Q was signed by Defendant Hyzer and was accompanied by SOX

9

Certifications signed by Defendants Schuck and Hyzer, wherein they attested to the accuracy of

10

the 1Q23 10-Q.

11

159.    The statements contained in ¶¶ 141-157 were materially false and misleading

12

because they failed to disclose, *inter alia*, that: (a) the COVID-19 pandemic had temporarily

13

inflated the use of the Company's platform; (b) the increase in the Company's customers and

14

business was only temporary due to the pandemic; (c) in order to retain the diminishing customer

15

base, the Company instituted deceptive and coercive auto-renewal policies; (d) as a result, the

16

Company's reported revenues, operating income, and customer and retention metrics were

17

materially overstated; (e) the Company failed to maintain adequate oversight and internal controls

18

over its financial reporting; and (f) as a result of the foregoing, positive statements regarding the

19

Company's business, operations, and prospects were materially false and misleading and lacked a

20

reasonable basis at all relevant times.

21

160.    On July 31, 2023, the Company issued a press release announcing its financial

22

results for the second quarter of 2023 (the "2Q23 Earnings Release"). The 2Q23 Earnings Release

23

revealed that the number of the Company's customers with $100,000 or greater in ACV had

24

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 52
Case No.  3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

1     decreased from 1,905 the previous quarter to 1,893 for the current quarter.

2         161.     On the same day, the Company hosted an earnings call for investors and analysts

3 to discuss its financial results for the second quarter of 2023 (the "2Q23 Earnings Call"), wherein

4 Defendant Shuck revealed that the Company was seeing "modestly more cancellations this year

5 than [] last year" and that the Company expected "gross retention to tick down a little." Defendant

6 Hyzer also revealed in the 2Q23 Earnings Call that the Company was adjusting its revenue for the

7 full year down to a range of $1.225 billion to $1.235 billion.

8         162.     On this news, the Company's stock price dropped $7.17 per share over the course

9 of two days, or approximately 28%, to close at $18.40 per share on August 2, 2023.

10         163.     However, despite this negative information, the Individual Defendants continued

11 to make materially false and misleading statements about the Company's business, operations, and

12 financial results, including in the 2Q23 Earnings Release and during the 2Q23 Earnings Call.

13         164.     Indeed, in the 2Q23 Earnings Release, the Company reported that its quarterly

14 revenue increased 16% year-over-year to $308.6 million, and that its quarterly operating income

15 increased 51% year-over-year to $59.6 million. Defendant Schuck was also quoted in the 2Q23

16 Earnings Release as stating that "[i]n Q2 we delivered another quarter of revenue growth, increased

17 profitability, and free cash flow generation."

18         165.     Additionally, during the 2Q23 Earnings Call, Defendant Schuck represented that

19 the Company was expending great efforts to retain customers, stating:

20          And I think, Alex, one of the things that we're doing internally operationally is
         giving our -- working with those customers as they downsize so that they stay with

21          us and we have an opportunity to grow with them in the future. We have another
         customer example that had literally 600 salespeople in 2021 has 20 today. And

22          that's a contract that was in our 100k cohort and is now a $30,000 a year contract.
         But our mentality around that is, let's work with this customer, let's keep the

23          contract.

24 VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 53
Case No. 3:25-cv-05088

We're both on the same page about growing back up with them in the future. And so, from a gross retention perspective, we're doing everything we can to hold on to those customers so that as they turn the corner and start thinking about growth again that we're a trusted partner on that journey.

166.    Furthermore, on the same day, July 31, 2023, the Company filed its quarterly report for the period ended June 30, 2023 on a Form 10-Q with the SEC (the "2Q23 10-Q"). The 2Q23 10-Q contained the same information regarding the Company's revenue, operating income, and customers as was reported in the 2Q23 Earnings Release. *See* ¶ 164.  In addition, the 2Q23 10-Q reported that the Company had total RPOs of $1.110 billion, with $848.7 million in RPOs to be recognized within one year. The 2Q23 10-Q also reported that the Company had $207.2 million in net accounts receivable for the quarter and contained the following sections regarding its accounts receivables and customer contracts:

> ***Concentrations of Credit Risk and Significant Customers***. . . .
>
> We do not require collateral from clients. We maintain an allowance for credit losses based upon the expected collectability of accounts receivable. The Company performs ongoing credit evaluations of its customers and maintains allowances for possible losses, which, when realized, have been within the range of management's expectations. . . .
>
> ***Accounts Receivable and Contract Assets***
>
> Accounts receivable is comprised of invoices of revenue, net of allowance for credit losses, and does not bear interest. We consider receivables past due based on the contractual payment terms. Management's evaluation of the adequacy of the allowance for credit losses considers historical collection experience, changes in customer payment profiles, the aging of receivable balances, as well as current economic conditions, all of which may impact a customer's ability to pay. Account balances are written-off against the allowance after all means of collection have been exhausted and the potential for recovery is considered remote. ***The Company does not have significant bad debt experience with customers, and therefore, the allowance for credit losses is immaterial as of June 30, 2023 and December 31, 2022.***

(Emphasis added).

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 54
Case No.  3:25-cv-05088

167.    The 2Q23 10-Q was signed by Defendant Hyzer and was accompanied by SOX Certifications signed by Defendants Schuck and Hyzer, wherein they attested to the accuracy of the 2Q23 10-Q.

168.    On October 30, 2023, the Company issued a press release announcing its financial results for the third quarter of 2023 (the "3Q23 Earnings Release"). The 3Q23 Earnings Release reported that the Company's quarterly revenue was up 9% year-over-year to $313.8 million for the quarter, and that its quarterly net operating income was up 22% year-over-year to $63.1 million for the quarter. The 3Q23 Earnings Release also revealed that the Company closed the quarter with 1,869 customers with $100,000 or greater in ACV.

169.    On the same day, the Company held an earnings call for investors and analysts to discuss the financial results for the third quarter of 2023 (the "3Q23 Earnings Call"). During the 3Q23 Earnings Call, in response to a question regarding customer retention, Defendant Hyzer touted the strength of the Company's new customer base, stating, in relevant part:

> And as I mentioned before, between September '22 and March 2024, we'll have transacted with approximately 90% of our ACV. And I think we really need to get through that period of having renewed or sold ACV with those customers ahead of time. The assumptions really are very focused on renewals. New business continues to be relatively strong.
>
> Obviously, the environment impacts that as well, but the sales efficiency of our new business team and the demand that we see continue to be good out there. And we continue to bring on new customers to support that. So, we're really focused much more on mitigating and getting through this renewal cycle that we're in right now.

170.    Also on October 30, 2023, the Company filed its quarterly report for the period ended September 30, 2023 on a Form 10-Q with the SEC (the "3Q23 10-Q"). The 3Q23 10-Q included the same information regarding the Company's revenue, operating income, and customers as was reported in the 3Q23 Earnings Release. *See* ¶ 168. The 3Q23 10-Q also reported

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 55
Case No.  3:25-cv-05088

BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

that the Company had total RPOs of $1.056 billion, with $795.2 million to be recognized within one year. Furthermore, the 3Q23 10-Q reported that the Company had net accounts receivable of $218.6 million for the quarter and included the following sections on the Company's accounts receivables and customer contracts:

*Concentrations of Credit Risk and Significant Customers*. . . .

We do not require collateral from clients. We maintain an allowance for credit losses based upon the expected collectability of accounts receivable. The Company performs ongoing credit evaluations of its customers and maintains allowances for possible losses, which, when realized, have been within the range of management's expectations. . . .

*Accounts Receivable and Contract Assets*

Accounts receivable is comprised of invoices of revenue, net of allowance for expected credit losses, and does not bear interest. We consider receivables past due based on the contractual payment terms. Management's evaluation of the adequacy of the allowance for credit losses considers historical collection experience, changes in customer payment profiles, the aging of receivable balances, as well as current economic conditions, all of which may impact a customer's ability to pay. Account balances are written-off against the allowance after all means of collection have been exhausted and the potential for recovery is considered remote. ***As of September 30, 2023 and December 31, 2022, the allowance for expected credit losses was not significant to the accompanying consolidated financial statements.***

(Emphasis added).

171. The 3Q23 10-Q was signed by Defendant Hyzer and was accompanied by SOX Certifications signed by Defendants Schuck and Hyzer, wherein they attested to the accuracy of the 3Q23 10-Q.

172. On February 12, 2024, the Company issued a press release announcing its financial results for the fourth quarter and full year of 2023 (the "4Q23 Earnings Release"). In the 4Q23 Earnings Release, the Company reported that its quarterly revenue was up 5% year-over-year to $316.4 for the quarter, and that its quarterly operating income was up 35% year-over-year to $70.5

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 56
Case No. 3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

million for the quarter. The 4Q23 Earnings Release also reported that the Company's annual revenue was up 14% year-over-year, with $1.239 billion in revenue for 2023. The 4Q23 Earnings Release stated that the Company's NRR was 87% for 2023 and that the Company closed the quarter with 1,820 customers with $100,000 or greater in ACV.

173.    On the same day, the Company held an earnings call for investors and analysts to discuss the financial results for the fourth quarter of 2023 (the "4Q23 Earnings Call"). During the 4Q23 Earnings Call, Defendant Schuck highlighted the Company's "demand and sales velocity for new business," stating, in relevant part:

> New businesses performed well, while NRR has declined as the pullback in the software vertical has disproportionately impacted our existing customer base, resulting in fewer upsells and more seat downsells. However, our demand and sales velocity for new business was our best ever. We closed the most new logos on record in Q4, our in-month create-and-close win rate for December was the highest we've ever had in a single month, and our median sales cycle shortened significantly year over year.

174.    In the 4Q23 Earnings Call, in response to a question regarding the Company's NRR, Defendant Schuck again highlighted the Company's success with new customers, stating:

> Throughout the year relative to the customer base, new business demand and closed stayed strong. We saw that continued throughout the year. And then, at the end of the year, we brought on the most new logos we've had in a quarter. We had great metrics around the new sales motion.
>
> And then, we had many customers who had left come back to us as well. So, we feel pretty good about our ability to forecast demand on the new business side and see it continuing strength throughout 2024.

175.    In response to the same question, Defendant Hyzer, stated, in relevant part, "[s]o, I think we are seeing, you know, kind of our strongest players in the field, you know, stay with us. They had a, you know, a good Q4, as Henry mentioned earlier in his remarks. And I think seeing that continue is something that we're excited about."

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 57
Case No.  3:25-cv-05088

176. Additionally, in response to a question regarding churn at the small-to-medium business ("SMB") level, Defendant Hyzer stated, in relevant part:

Sure. So, you know, our churn levels have actually remained fairly stable in '23. They're a little down from what we saw in '22 but not meaningfully so. Obviously, that part of the equation is largely driven by, you know, the lower end of the market.

And so, while we do see pressure on SMBs particularly around write-offs and, you know, some downsells and kind of price requirements, we don't see a meaningful increase in the churn that we're seeing where we have seen a much bigger impact on net retention has been particularly in the midmarket and the lower end of enterprise where, you know, we've seen downsell.

177. On February 15, 2024, the Company filed the 2023 10-K. The 2023 10-K contained the same information about the Company's revenue, operating income, customers, and NRR as was reported in the 4Q23 Earnings Release. *See* ¶ 172. In addition, the 2023 10-K reported that the Company had total RPOs of $1.152 billion, with $856.4 million in RPOs to be recognized within one year. The 2023 10-K also stated that the Company had $272 million in accounts receivables for the year and contained the following sections on the Company's customers and accounts:

***Concentrations of Credit Risk and Significant Customers***. . . .

We do not require collateral from clients. We maintain an allowance for credit losses based upon the expected collectability of accounts receivable. The Company performs ongoing credit evaluations of its customers and maintains allowances for possible losses, which, when realized, have been within the range of management's expectations. . . .

***Accounts Receivable and Contract Assets***

Accounts receivable is comprised of invoices of revenue, net of allowance for expected credit losses, and does not bear interest. We consider receivables past due based on the contractual payment terms. Management's evaluation of the adequacy of the allowance for credit losses considers historical collection experience, changes in customer payment profiles, the aging of receivable balances, as well as current economic conditions, all of which may impact a customer's ability to pay. Account balances are written-off against the allowance after all means of collection

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 58
Case No.  3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

1    have been exhausted and the potential for recovery is considered remote. *As of*
2    *December 31, 2023 and 2022, the allowance for expected credit losses was not*
     *significant to the accompanying consolidated financial statements.*

3    (Emphasis added).

4    178.    The 2023 10-K was signed by Defendants Schuck, Crockett, Dhruv, Enright,

5    Evans, Gleeson, Mader, McCarter, Winn, and Hyzer. The 2023 10-K was also accompanied by

6    SOX Certifications signed by Defendants Schuck and Hyzer, wherein they attested to the accuracy

7    of the 2023 10-K.

8    179.    On March 29, 2024, the Company filed its annual proxy statement for 2024 on a

9    Schedule 14A with the SEC (the "2024 Proxy"). In a section titled "Oversight of Risk

10   Management," the 2024 Proxy stated:

11       The Board has extensive involvement in the oversight of risk management related
         to us and our business. The Board accomplishes this oversight both directly and
12       through its Audit Committee, Compensation Committee, Nominating and
         Corporate Governance Committee, and Privacy, Security and Technology
13       Committee, each of which assists the Board in overseeing a part of our overall risk
         management and regularly reports to the Board. The Audit Committee represents
14       the Board by periodically reviewing our accounting, reporting and financial
         practices, including the integrity of our financial statements, the oversight of
15       administrative and financial controls, our compliance with legal and regulatory
         requirements and our policies with respect to risk assessment and risk management.
16       Through its regular meetings with management, including the finance, legal and
         internal audit functions, the Audit Committee reviews and discusses significant
17       areas of our business and related risks and summarizes for the Board areas of risk
         and any mitigating factors. The Compensation Committee considers, and discusses
18       with management, management's assessment of certain risks, including whether
         any risks arising from our compensation policies and practices for our employees
19       are reasonably likely to have a material adverse effect on us. The Nominating and
         Corporate Governance Committee oversees and evaluates programs and risks
20       associated with Board organization, membership and structure, succession planning
         and corporate governance. In addition, our Board receives periodic detailed
21       operating performance reviews from management. The Privacy, Security and
         Technology Committee, represents the Board by periodically reviewing and
22       discussing with Company management the Company's major risk exposures
         relating to privacy, cybersecurity, and technology, and the steps the Company takes
23       to detect, monitor, and actively manage such exposures.

24   VERIFIED SHAREHOLDER DERIVATIVE              **BADGLEY MULLINS TURNER** PLLC
     COMPLAINT - 59                               19910 50ᵗʰ Ave. W. Suite 103
     Case No.  3:25-cv-05088                      Lynnwood, WA 98036
                                                  **TEL** 206.621.6566
                                                  **FAX** 206.621.9686

180. Defendants Schuck, Enright, Evans, Mader, Winn, Gleeson, and McCarter each solicited the 2024 Proxy.

181. The statements contained in ¶¶ 164-179 were materially false and misleading because they failed to disclose, *inter alia*, that: (a) the COVID-19 pandemic had temporarily inflated the use of the Company's platform; (b) the increase in the Company's customers and business was only temporary due to the pandemic; (c) in order to retain the diminishing customer base, the Company instituted deceptive and coercive auto-renewal policies; (d) as a result, the Company's reported revenues, operating income, and customer and retention metrics were materially overstated; (e) the Company failed to maintain adequate oversight and internal controls over its financial reporting; and (f) as a result of the foregoing, positive statements regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

182. On May 7, 2024, the Company issued a press release announcing its financial results for the first quarter of 2024 (the "1Q24 Earnings Release"). In the 1Q24 Earnings Release, the Company revealed that its annual revenue guidance for 2024 was being reduced from a range of $1.26 billion to $1.28 billion to a range of $1.255 billion to $1.27 billion.

183. On the same day, the Company held an earnings call for analysts and investors to discuss its financial results for the first quarter of 2024 (the "1Q24 Earnings Call"). During the 1Q24 Earnings Call, when asked about the reduction in revenue guidance, Defendant Hyzer accredited it to weakness in SMB, stating:

> So, certainly, the SMB weakness is something that impacted us, particularly in Q1 as we had a higher or a larger pool of renewals coming in, in Q1. We also saw new business a little behind where we wanted it to be, also **based on there being a fair amount of SMB weakness** -- SMB concentration within new business, as well as

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 60
Case No. 3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

1    our shift to be more selective in the deals that we're pulling in. So, expecting that,
2    that should help us remove some of the headwinds around write-offs as we get
     further into the second half of the year.

3        184.    During the 1Q24 Earnings Call, Defendant Hyzer also revealed that the Company's

4    NRR for the quarter was 85%, was a 2% reduction from the 87% NRR for 2023 reported in the

5    4Q23 Earnings Release.

6        185.    On this news, ZoomInfo's stock price dropped $3.88 per share, or approximately

7    24%, to close at $12.14 per share on May 8, 2024.

8        186.    Despite these seemingly negative results, the Individual Defendants continued to

9    issue materially false and misleading statements to the public regarding the Company's business,

10   operations, and financial results.

11       187.    Indeed, the 1Q24 Earnings Release attempted to highlight the Company's

12   "positive" results, reporting that the Company's quarterly revenue was up 3% year-over-year to

13   $310.1 million for the quarter. The Company also reported quarterly operating income of $43

14   million, although this was a decrease of 35% year-over-year. The 1Q24 Earnings Release stated

15   that the Company closed the quarter with 1,760 customers with $100,000 or greater in ACV.

16   Defendant Schuck was quoted in the 1Q24 Earnings Release as stating "[w]e delivered another

17   quarter of revenue growth, with better-than-expected profitability, and stabilizing net revenue

18   retention."

19       188.    During the 1Q24 Earnings Call on the same day, Defendant Schuck attempted to

20   assure investors that the Company's business was stable, stating, in relevant part:

21           We saw enterprise retention stabilize, and we saw renewal rates there improve year
             over year for the first time since 2022. Software retention also stayed flat
22           sequentially for the first time since Q1 of '22. ***These stabilization trends have
             continued into Q2 and are promising signs that suggest we have reached a
23           bottom, which we view as a precursor to a potential inflection to growth. We also***

24   VERIFIED SHAREHOLDER DERIVATIVE
     COMPLAINT - 61
     Case No.  3:25-cv-05088

*had a number -- we also had another quarter of strong win-back performance.*

*Customers continue to come back in record numbers* after trying low-cost, low-quality providers. In Q1, we again saw hundreds of customers come back to ZoomInfo, maintaining the record levels from Q4 and Q3 2023.

(Emphasis added).

189.    Also on May 7, 2024, the Company filed its quarterly report for the period ended March 31, 2024 on a Form 10-Q with the SEC (the "1Q24 10-Q"). The 1Q24 10-Q contained the same information regarding the Company's revenue, operating income, and customers as was reported in the 1Q24 Earnings Release. *See* ¶ 187. In addition, the 1Q24 10-Q reported that the Company had total RPOs of $1.133 billion, with $837.8 million to be recognized within one year. The 1Q24 10-Q also reported that the Company had net accounts receivables of $223.5 million for the quarter and included the following sections on the Company's accounts receivables and customer contracts:

*Concentrations of Credit Risk and Significant Customers*. . . .

We do not require collateral from clients. We maintain an allowance for credit losses based upon the expected collectability of accounts receivable. The Company performs ongoing credit evaluations of its customers and maintains allowances for possible losses, which, when realized, have been within the range of management's expectations. . . .

*Accounts Receivable and Contract Assets*

Accounts receivable is comprised of invoices of revenue, net of allowance for expected credit losses, and does not bear interest. We consider receivables past due based on the contractual payment terms. Management's evaluation of the adequacy of the allowance for credit losses considers historical collection experience, changes in customer payment profiles, the aging of receivable balances, as well as current economic conditions, all of which may impact a customer's ability to pay. Account balances are written-off against the allowance after all means of collection have been exhausted and the potential for recovery is considered remote. *As of March 31, 2024 and December 31, 2023, the allowance for expected credit losses was not significant to the accompanying consolidated financial statements.*

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 62
Case No.  3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

(Emphasis added).

190.    The statements contained in ¶¶ 187-189 were materially false and misleading because they failed to disclose, *inter alia*, that: (a) the COVID-19 pandemic had temporarily inflated the use of the Company's platform; (b) the increase in the Company's customers and business was only temporary due to the pandemic; (c) in order to retain the diminishing customer base, the Company instituted deceptive and coercive auto-renewal policies; (d) as a result, the Company's reported revenues, operating income, and customer and retention metrics were materially overstated; (e) the Company failed to maintain adequate oversight and internal controls over its financial reporting; and (f) as a result of the foregoing, positive statements regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Truth Emerges***

191.    As detailed above, the truth began to be revealed as early as November 1, 2022. However, it was not until August 5, 2024, that the truth was fully revealed.

192.    Finally, on August 5, 2024, the Company issued the 2Q24 Earnings Release and revealed that the Company was incurring a $33 million charge due to non-payments from customers and that, as a result, the Company was implementing a new business risk model. The 2Q24 Earnings Release stated, in relevant part:

> "In the second quarter, we implemented a number of initiatives to position the company for long-term success," said Henry Schuck, ZoomInfo founder and CEO. "Having successfully launched ZoomInfo Copilot, our AI-powered go-to-market platform, we are further accelerating a shift upmarket. To that end, in the quarter we grew our $100k ACV customer cohort sequentially, had our best new business quarter in the mid-market and enterprise, while we stabilized net revenue retention.
>
> Schuck continued, "We deployed a new business risk model to reduce write-offs and made a change in estimates related to the collectibility of receivables. I am

confident that this will strengthen our future financial position and enable the company to deliver strong and growing free cash flow."

During the quarter, the company made a change in estimates related to the collectibility of receivables from customers and changed operational procedures to require upfront pre-payment for services from certain smaller customers. As a result, the company recorded incremental charges of $33 million primarily related to the change in estimates. Of the $33 million, $15 million was recorded against revenue, $14 million was recorded as bad debt expense, and $4 million was related to other discrete items.

193.    The 2Q24 Earnings Release also revealed that the Company again reduced its annual revenue guidance, reducing it to a range of $1.190 billion to $1.205 billion from the previously reported range of $1.255 billion to $1.27 billion.

194.    On the same day, the Company held an earnings call for investors and analysts to discuss the Company's financial results for the second quarter of 2024 (the "2Q24 Earnings Call"). During the 2Q24 Earnings Call, Defendant Hyzer reported the reasoning behind the $33 million charge, stating, in relevant part:

We were disappointed and surprised to determine that our prior estimates for nonpayment from customers needed to be increased in order to account for escalating write-offs that we incurred in June as well as additional write-offs that we now expect. This change in estimates, combined with other discrete charges, resulted in a total $33 million charge in Q2, of which $15 million reduced revenue, $14 million increased our bad debt expense, and $4 million increased other expenses. The change in estimate relates to previously recognized revenue primarily from 2023 and includes sufficient reserves to cover potential nonpayment on our current receivables and related revenue recognized to date.

195.    On this news, the price of ZoomInfo stock declined $1.79 per share, or approximately 18%, to close at $8.01 on August 6, 2024.

**Insider Sales**

196.    During the Relevant Period, Defendants Schuck, Hyzer, Winn, Crockett, Enright, and Mader made sales of ZoomInfo's common stock while in possession of non-public information

concerning the Company's financial condition and business prospects.

197.    While the Company's stock price was artificially inflated, Defendant Schuck sold approximately 20 million shares of ZoomInfo common stock, totaling proceeds of over $1 billion. Defendant Schuck made the following sales of ZoomInfo stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 12/15/2020 | 400,000 | $41.41 | $16,564,000 |
| 1/15/2021 | 291,708 | $45.67 | $13,322,304.36 |
| 1/19/2021 | 108,292 | $46.70 | $5,507,236.40 |
| 1/26/2021 | 20,633 | $50.04 | $1,032,475.32 |
| 1/27/2021 | 71,599 | $50.02 | $3,581,381.98 |
| 3/15/2021 | 225,750 | $47.56 | $10,735,670.00 |
| 3/16/2021 | 174,250 | $49.09 | $8,553,932.50 |
| 4/15/2021 | 262,665 | $47.81 | $12,558,013.65 |
| 4/16/2021 | 137,336 | $47.38 | $6,506,979.68 |
| 5/14/2021 | 400,000 | $40.10 | $16,040,000.00 |
| 6/15/2021 | 400,000 | $45.04 | $18,016,000.00 |
| 7/15/2021 | 264,580 | $49.30 | $13,043,794.00 |
| 7/16/2021 | 135,420 | $50.17 | $6,794,021.40 |
| 8/4/2021 | 786,607 | $60.26 | $47,400,937.82 |
| 8/5/2021 | 213,393 | $61.35 | $13,091,660.60 |
| 8/6/2021 | 3,286,639 | $54.75 | $179,943,485.25 |
| 8/11/2021 | 2,545,328 | $62.00 | $157,810,336.00 |
| 8/16/2021 | 400,000 | $59.70 | $23,880,000.00 |
| 9/2/2021 | 386,020 | $62.00 | $23,933,240.00 |
| 9/15/2021 | 400,000 | $66.67 | $26,668,000.00 |
| 11/16/2021 | 929,327 | $76.00 | $70,628,852.00 |
| 11/17/2021 | 370,673 | $76.73 | $28,441,739.30 |
| 11/23/2021 | 1,300,000 | $68.32 | $88,816,000.00 |
| 11/30/2021 | 1,127,028 | $63.05 | $71,059,115.40 |
| 3/18/2022 | 31,328 | $60.00 | $1,879,773.00 |
| 3/23/2022 | 114,584 | $60.15 | $6,892,227.60 |
| 3/31/2022 | 20,380 | $60.02 | $1,223,207.60 |
| 4/1/2022 | 25,588 | $60.08 | $1,537,327.04 |
| 4/4/2022 | 188,120 | $60.23 | $11,330,467.60 |
| 5/18/2022 | 254,102 | $42.89 | $10,989,434.80 |
| 5/19/2022 | 45,898 | $42.24 | $1,938,731.52 |
| 6/3/2022 | 48,264 | $42.05 | $2,029,501.20 |
| 6/6/2022 | 143,761 | $42.36 | $6,089,715.96 |
| 12/19/2022 | 1,000,000 | $28.16 | $28,160,000.00 |

BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

| | | | |
|---|---|---|---|
| 1/9/2023 | 1,000,000 | $25.54 | $25,540,000.00 |
| 2/8/2023 | 1,041,667 | $28.28 | $29,458,342.80 |
| 6/16/2023 | 2,083,334 | $26.52 | $55,250,017.70 |

198.    While the Company's stock price was artificially inflated, Defendant Hyzer sold approximately 604,343 shares of ZoomInfo common stock, totaling proceeds of nearly $35 million. Defendant Hyzer made the following sales of ZoomInfo stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 12/22/2020 | 90,950 | $45.32 | $4,121,854 |
| 3/1/2021 | 18,497 | $55.33 | $1,023,439.01 |
| 3/2/2021 | 9,290 | $56.25 | $522,562.50 |
| 6/1/2021 | 18,174 | $42.73 | $776,575.02 |
| 8/4/2021 | 9,292 | $58.11 | $539,958.12 |
| 8/9/2021 | 28,140 | $61.21 | $1,722,449.4 |
| 9/15/2021 | 300,000 | $66.89 | $20,067,000.00 |
| 11/17/2021 | 15,000 | $76.71 | $1,150,650.00 |
| 12/17/2021 | 15,000 | $60.35 | $950,250.00 |
| 3/18/2023 | 35,893 | $60.00 | $2,153,580.00 |
| 3/23/2022 | 9,107 | $60.02 | $546,602.14 |
| 9/9/2022 | 5,000 | $43.70 | $218,500.00 |
| 10/10/2022 | 5,000 | $43.39 | $216,950.00 |
| 5/3/2023 | 10,000 | $22.09 | $220,900.00 |
| 6/5/2023 | 10,000 | $26.46 | $264,600.00 |
| 7/5/2023 | 10,000 | $25.46 | $254,600.00 |
| 6/13/2024 | 7,500 | $12.78 | $95,850.00 |
| 7/9/2024 | 7,500 | $12.37 | $92,775.00 |

199.    While the Company's stock price was artificially inflated, Defendant Winn sold approximately 416,068 shares of ZoomInfo common stock, totaling proceeds of approximately $23.3 million. Defendant Winn made the following sales of ZoomInfo stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 12/4/2020 | 83,260 | $43.88 | $3,653,448.80 |
| 8/2/2021 | 21,434 | $55.02 | $1,179,298.68 |
| 8/6/2021 | 132,598 | $54.75 | $7,259,740.50 |

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 66
Case No. 3:25-cv-05088

| 8/11/2021 | 102,690 | $62.00 | $6,366,780.00 |
| 9/2/2021 | 15,404 | $62.00 | $955,048.00 |
| 9/13/2021 | 60,682 | $64.81 | $3,932,800.42 |

200.    While the Company's stock price was artificially inflated, Defendant Crockett directly sold approximately 8,956,132 shares of ZoomInfo common stock, totaling proceeds of approximately $592.4 million. Defendant Crockett made the following direct sales of ZoomInfo stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 2/3/2021 | 1,734,233 | $54.03 | $93,700,608.89 |
| 2/5/2021 | 568,845 | $58.05 | $33,021,452.25 |
| 2/8/2021 | 59,903 | $58.04 | $3,476,770.12 |
| 2/11/2021 | 13,935 | $56.30 | $7,361,641.33 |
| 2/16/2021 | 126,641 | $58.13 | $44,458,780.20 |
| 2/23/2021 | 754,818 | $58.90 | $44,458,780.20 |
| 8/9/2021 | 3,620,333 | $61.60 | $221,202,346.30 |
| 9/16/2021 | 464,877 | $68.12 | $31,667,421.24 |
| 11/2/2021 | 1,612,547 | $70.15 | $113,120,172.05 |

201.    While the Company's stock price was artificially inflated, Defendant Enright sold approximately 2,200 shares of ZoomInfo common stock, totaling proceeds of approximately $130,352. Defendant Enright made the following sales of ZoomInfo stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 8/16/2021 | 555 | $62.00 | $34,410.00 |
| 11/15/2021 | 555 | $74.92 | $41,580.60 |
| 3/5/2022 | 555 | $52.95 | $29,387.25 |
| 8/3/2022 | 555 | $45.00 | $24,975.00 |

202.    While the Company's stock price was artificially inflated, Defendant Mader sold approximately 15,691 shares of ZoomInfo common stock, totaling proceeds of approximately $753,338. Defendant Mader made the following sales of ZoomInfo stock during the Relevant

Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 12/15/2021 | 7,500 | $60.49 | $453,675.00 |
| 5/4/2022 | 5,079 | $51.17 | $259,892.43 |
| 6/13/2024 | 3,112 | $12.78 | $39,771.36 |

203.    As a result of these insider sales, Defendants Schuck, Hyzer, Winn, Crockett, Enright, and Mader were unjustly enriched.

**Stock Repurchases During the Relevant Period**

204.    According to the Company's public filings, while the price of Company stock was artificially inflated due to the false and misleading statements detailed above, the Individual Defendants caused the Company to repurchase approximately 45 million shares of its own stock, for a total of nearly $730 million, between December 2020 and July 2024.

205.    According to the Company's public filings, ZoomInfo made the following repurchases of its own stock during the Relevant Period:

| Dates of Stock Repurchase | Number of Shares Repurchased | Average Price Per Share on Date of Repurchase | Total Cost of Repurchase |
|---|---|---|---|
| December 1, 2020 to December 31, 2020 | 20,617 | $46.06 | $949,619.02 |
| September 1, 2021 to September 30, 2021 | 20,636 | $65.19 | $1,345,260.84 |
| November 1, 2021 to November 30, 2021 | 6,023 | $69.71 | $419,863.33 |
| December 1, 2021 to December 31, 2021 | 7,522 | $61.70 | $646,107.40 |
| March 1, 2022 to March 31, 2022 | 8,292 | $54.69 | $453,489.48 |
| May 1, 2022 to May 31, 2022 | 6,395 | $51.99 | $332,476.05 |
| June 1, 2022 to June 30, 2022 | 6,121 | $40.39 | $247,227.19 |
| August 1, 2022 to August 31, 2022 | 6,333 | $41.97 | $265,796.01 |

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 68
Case No.  3:25-cv-05088

| September 1, 2022 to September 30, 2022 | 8,332 | $45.42 | $378,439.44 |
| November 1, 2022 to November 30, 2022 | 6,186 | $30.81 | $190,590.66 |
| December 1, 2022 to December 31, 2022 | 8,164 | $28.60 | $233,490.04 |
| February 1, 2023 to February 28, 2023 | 9,133 | $30.24 | $276,181.92 |
| March 1, 2023 to March 31, 2023 | 1,067,234 | $23.00 | $24,546,382 |
| April 1, 2023 to April 30, 2023 | 1,477,121 | $22.56 | $33,323,849.80 |
| May 1, 2023 to May 31, 2023 | 1,404,890 | $21.41 | $30,078,694.90 |
| June 1, 2023 to June 30, 2023 | 6,166 | $24.73 | $152,485.18 |
| August 1, 2023 to August 31, 2023 | 8,408,022 | $18.18 | $152,857,840 |
| September 1, 2023 to September 30, 2023 | 407,152 | $18.42 | $7,499,739.84 |
| October 1, 2023 to October 31, 2023 | 5,902,722 | $16.61 | $98,044,212.40 |
| November 1, 2023 to November 30, 2023 | 3,325,528 | $13.37 | $44,462,309.40 |
| December 1, 2023 to December 31, 2023 | 704,434 | $15.30 | $10,777,840.20 |
| January 1, 2024 to January 31, 2024 | 5,330,167 | $16.13 | $85,975,593.70 |
| February 1, 2024 to February 28, 2024 | 2,339,072 | $15.45 | $36,138,662.40 |
| March 1, 2024 to March 31, 2024 | 1,906,662 | $15.86 | $30,239,659.30 |
| April 1, 2024 to April 30, 2024 | 2,952,427 | $15.80 | $46,648,346.60 |
| May 1, 2024 to May 31, 2024 | 4,705,212 | $13.22 | $62,202,902.60 |
| June 1, 2024 to June 30, 2024 | 3,115,285 | $12.27 | $38,715,347 |
| July 1, 2024 to July 31, 2024 | 1,750,537 | $11.93 | $20,883,906.40 |

206.    Given that the price of ZoomInfo stock was $8.01 per share after the corrective disclosures on August 5, 2024, the true value of the 44,916,385 repurchased shares was roughly

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 69
Case No.  3:25-cv-05088

BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

$360 million.  Accordingly, the Individual Defendants caused the Company to overpay by approximately *$370 million* to repurchase these shares during the Relevant Period.

***Harm to the Company***

207.    As a direct and proximate result of the Individual Defendants' misconduct, ZoomInfo has lost and expended, and will lose and expend, millions of dollars.

208.    Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendants Schuck and Hyzer, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

209.    Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, as well as the hundreds of millions of dollars the Individual Defendants caused the Company to spend in repurchasing its stock at artificially inflated prices during the Relevant Period.

210.    Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

211.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

212.    ZoomInfo is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

213.    Plaintiff is a current shareholder of ZoomInfo and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

1    rights and retained counsel competent and experienced in derivative litigation.

2    214.    A pre-suit demand on the Board of ZoomInfo is futile and, therefore, excused. At

3    the time this action was commenced, the ten-member Board was comprised of Defendants Enright,

4    Evans, Gleeson, Mader, McCarter, Schuck, and Winn (the "Director Defendants"), and non-parties

5    Domenic Maida, Katie Rooney, and Owen Wurzbacher (collectively with the Director Defendants,

6    the "Directors").  Accordingly, Plaintiff is only required to show that five Directors cannot exercise

7    independent objective judgment about whether to bring this action or whether to vigorously

8    prosecute this action. As set forth below, all seven of the Director Defendants are incapable of

9    making an independent and disinterested decision to institute and vigorously prosecute this action,

10   including because they face a substantial likelihood of liability, and so demand on the Board to

11   institute this action is not necessary because such a demand would have been a futile act.

12   215.    The Director Defendants either knew or should have known of the false and

13   misleading statements that were issued on the Company's behalf and took no steps in a good faith

14   effort to prevent or remedy that situation.

15   216.    Additionally, each of the Director Defendants approved and/or permitted the

16   wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those

17   wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded

18   the wrongs complained of herein and are therefore not disinterested parties.

19   217.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform

20   themselves of, the obvious problems with the Company's internal controls, practices, and

21   procedures and failed to make a good faith effort to correct the problems or prevent their

22   recurrence.

23   218.    Defendant Schuck is not disinterested or independent and is therefore incapable of

24
VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 71
Case No.  3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

considering a demand. Defendant Schuck is a co-founder of the Company and serves as the Company's CEO. Thus, the Company admits that Defendant Schuck is a non-independent director. Furthermore, Defendant Schuck is named as a defendant, and therefore faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

219. Moreover, the 2020 10-K and 2021 10-K were signed by Defendants Schuck, Enright, Evans, Mader, McCarter, and Winn, and the 2022 10-K and 2023 20-K were signed by Defendants Schuck, Enright, Evans, Gleeson, Mader, McCarter, and Winn. Additionally, the 3Q20 10-Q, the 2020 10-K, 1Q21 10-Q, 2Q21 10-Q, 3Q21 10-Q, 2021 10-K, 1Q22 10-Q, 2Q22 10-Q, 3Q22 10-Q, 2022 10-K, 1Q23 10-Q, 2Q23 10-Q, 3Q23 10-Q, 2023 10-K, and 1Q24 10-Q were each accompanied by a SOX Certification signed by Defendant Schuck, wherein he attested to the accuracy of the information contained therein. Accordingly, all of the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile, and therefore, excused.

220. Furthermore, Defendants Schuck, Enright, Evans, Mader, and Winn each solicited the 2022 Proxy, which led to the reelection of Defendant Mader to the Board, allowing him to continue breaching his fiduciary duties to the Company.

221. Defendants Schuck, Enright, Evans, Mader, and Winn each solicited the 2023 Proxy, which led to the reelection of Defendants Crockett, McCarter, and Winn to the Board, allowing them to continue breaching their fiduciary duties to the Company.

222. Defendants Schuck, Enright, Evans, Mader, Winn, Gleeson, and McCarter each solicited the 2024 Proxy, which led to the reelection of Defendants Enright and Schuck to the Board, allowing them to continue breaching their fiduciary duties to the Company.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 72
Case No. 3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

223.    Additionally, each of the Director Defendants received payments, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Furthermore, Defendants Schuck, Winn, Enright, and Mader each made insider sales of the Company's common stock while the price was artificially inflated as a result of the materially false and misleading statements alleged herein.

224.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures over financial reporting and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

225.    Defendants Enright, Evans, and Mader served on the Company's Audit Committee during the Relevant Period (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

226.    The Director Defendants, as members of the Board, were and are subject to the

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 73
Case No. 3:25-cv-05088

BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

227.    Additionally, the Director Defendants derive substantial revenue from the Company, control the Company, and are indebted to each other. Furthermore, the Director Defendants are not independent or disinterested due to their longstanding business and personal relationships with each other and the Company. For instance, Defendants Enright, Evans, Mader, McCarter, and Winn all previously served on the board of managers of ZoomInfo Holdings LLC, a subsidiary of the Company of which Defendant Schuck serves as the CEO.

228.    Accordingly, a pre-suit demand upon the Board is futile and excused.

## <u>COUNT I</u>

**Against the Individual Defendants for Violations of § 14(a)
of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)**

229.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

230.    The Individual Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

231.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 74
Case No.  3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

1    or of any facility of a national securities exchange or otherwise, in contravention of such rules and

2    regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the

3    protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent

4    or authorization in respect of any security (other than an exempted security) registered pursuant to

5    section 12 of this title [15 U.S.C. § 78l]."

6        232.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides

7    that no proxy statement shall contain "any statement which, at the time and in the light of the

8    circumstances under which it is made, is false or misleading with respect to any material fact, or

9    which omits to state any material fact necessary in order to make the statements therein not false

10   or misleading[.]" 17 C.F.R. § 240.14a-9

11       233.    The Individual Defendants, individually and in concert, disseminated and/or

12   permitted the dissemination of materially false and misleading statements in the 2022 Proxy, 2023

13   Proxy, and the 2024 Proxy (collectively, the "Proxy Statements"), which were all filed with the

14   SEC. As alleged above, the Proxy Statements were materially false and misleading because they

15   failed to disclose, *inter alia*: (a) the COVID-19 pandemic had temporarily inflated the use of the

16   Company's platform; (b) the increase in the Company's customers and business was only

17   temporary due to the pandemic; (c) in order to retain the diminishing customer base, the Company

18   instituted deceptive and coercive auto-renewal policies; (d) as a result, the Company's reported

19   revenues, operating income, and customer and retention metrics were materially overstated; (e)

20   the Company failed to maintain adequate oversight and internal controls over its financial

21   reporting; and (f) as a result of the foregoing, positive statements regarding the Company's

22   business, operations, and prospects were materially false and misleading and lacked a reasonable

23   basis at all relevant times.

24   VERIFIED SHAREHOLDER DERIVATIVE
     COMPLAINT - 75
     Case No. 3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

234.    The misrepresentations and omissions in the Proxy Statements were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, the reelection of certain Director Defendants.

235.    The materially false and misleading statements contained in the 2022 Proxy misleadingly induced shareholders to vote for the reelection of Defendant Mader to the Board, thereby allowing him to continue breaching his fiduciary duties to the Company.

236.    The materially false and misleading statements contained in the 2023 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Crockett, McCarter, and Winn to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

237.    The materially false and misleading statements contained in the 2024 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Enright and Schuck to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

238.    The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the Proxy Statements.

239.    As a result of the Individual Defendants' material misrepresentations and omissions, the Company has sustained significant damages.

240.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Violations of § 10(b)
### of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5

241.    Plaintiff incorporates by reference and realleges each and every allegation

1    contained above, as though fully set forth herein

2        242.    The Individual Defendants participated in a scheme with the purpose and effect of

3    defrauding ZoomInfo. Not only is ZoomInfo now defending claims that it violated Section 10(b)

4    of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one

5    of the largest victims of the unlawful scheme perpetrated upon ZoomInfo by the Individual

6    Defendants.

7        243.    During the Relevant Period, while the price of the Company's stock was artificially

8    inflated as a result of the false and misleading statements issued, the Individual Defendants caused

9    the Company to overpay by approximately $370 million to repurchase approximately 45 million

10    shares of ZoomInfo common stock.

11        244.    The Individual Defendants also individually and in concert, directly and indirectly,

12    by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and

13    participated in a continuous course of conduct designed to falsify the Company's press releases,

14    public statements, and periodic and current reports filed with the SEC.

15        245.    The Individual Defendants employed devices, schemes, and artifices to defraud

16    while in possession of adverse, material, non-public information and engaged in acts, practices

17    and a course of conduct that included the making of, or participation in the making of, untrue

18    and/or misleading statements of material facts and/or omitting to state material facts necessary in

19    order to make the statements made about ZoomInfo not misleading.

20        246.    The Individual Defendants, as directors and officers of the Company, are liable as

21    direct participants in the wrongs complained of herein. Through their positions of control and

22    authority as directors and officers of the Company, the Individual Defendants were able to and did

23    control the conduct complained of herein and the content of the public statements disseminated by

24

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 77
Case No. 3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

1    ZoomInfo.

2    247.    The Individual Defendants acted with scienter during the Relevant Period, in that

3    they either had actual knowledge of the scheme and the misrepresentations and/or omissions of

4    material facts set forth herein or acted with reckless disregard for the truth in that they failed to

5    ascertain and to disclose the true facts, even though such facts were available to them. The

6    Individual Defendants were the top executives of the Company, or received direct briefings from

7    them, and were therefore directly responsible for the scheme set forth herein and for the false and

8    misleading statements and/or omissions disseminated to the public through filings with the SEC.

9    248.    The Individual Defendants, through their violation of Section 10(b) of the

10    Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have caused the Company to expend over $700

11    million in the repurchase of ZoomInfo stock at artificially inflated prices and have exposed the

12    Company to millions of dollars in potential class-wide damages in the Securities Class Action.

13    249.    By virtue of the foregoing, the Individual Defendants have violated Section 10(b)

14    of the Exchange Act and Rule 10b-5 promulgated thereunder.

15    250.    Plaintiff, on behalf of ZoomInfo, has no adequate remedy at law.

### COUNT III

**Against the Individual Defendants**
**For Violations of Section 20(a) of the Exchange Act**

18    251.    Plaintiff incorporates by reference and realleges each and every allegation

19    contained above, as though fully set forth herein.

20    252.    The Individual Defendants acted as controlling persons of the Company within the

21    meaning of Section 20(a) of the Exchange Act. By virtue of their positions of control within the

22    Company, the Individual Defendants had the authority to cause the Company to issue materially

23    false and misleading statements, and to repurchase ZoomInfo stock at prices artificially inflated

24    VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 78
Case No.  3:25-cv-05088

by those materially false and misleading statements.

253.    Plaintiff, on behalf of ZoomInfo, has no adequate remedy at law

## COUNT IV

### Against the Individual Defendants
### For Breach of Fiduciary Duty

254.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

255.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

256.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

257.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the issuance of materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

258.    Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia,* that: (a) the COVID-19 pandemic had temporarily inflated the use of the Company's platform; (b) the increase in the Company's customers and business was only

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

temporary due to the pandemic; (c) in order to retain the diminishing customer base, the Company instituted deceptive and coercive auto-renewal policies; (d) as a result, the Company's reported revenues, operating income, and customer and retention metrics were materially overstated; (e) the Company failed to maintain adequate oversight and internal controls over its financial reporting; and (f) as a result of the foregoing, positive statements regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

259.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

260.    Additionally, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices during the Relevant Period.

261.    Furthermore, five of the Individual Defendants engaged in insider sales during the Relevant Period while the price of the stock was artificially inflated, netting billions of dollars in proceeds for themselves.

262.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

263.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 80
Case No. 3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

1    damages in the Securities Class Action, and damage to the share price of the Company's stock,

2    resulting in an increased cost of capital, and reputational harm.

3         264.    Plaintiff, on behalf of ZoomInfo, has no adequate remedy at law.

4                                    **COUNT V**

5                         **Against the Individual Defendants**
                              **For Gross Mismanagement**

6
7         265.    Plaintiff incorporates by reference and realleges each and every allegation

8    contained above, as though fully set forth herein.

9         266.    By their actions alleged herein, the Individual Defendants, either directly or through

10   aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

11   to prudently managing the assets and business of ZoomInfo in a manner consistent with the

12   operations of a publicly-held corporation.

13        267.    As a direct and proximate result of the Individual Defendants' gross

14   mismanagement and breaches of duty alleged herein, ZoomInfo has sustained, and will continue

15   to sustain, significant damages.

16        268.    As a result of the misconduct and breaches of duty alleged herein, the Individual

17   Defendants are liable to the Company.

18        269.    Plaintiff, on behalf of ZoomInfo, has no adequate remedy at law.

19                                   **COUNT VI**

20                        **Against the Individual Defendants**
                              **For Unjust Enrichment**

21        270.    Plaintiff incorporates by reference and realleges each and every allegation

22   contained above, as though fully set forth herein.

23        271.    By their wrongful acts, violations of law, and false and misleading statements and

24   VERIFIED SHAREHOLDER DERIVATIVE
     COMPLAINT - 81
     Case No. 3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

1    omissions of material fact that they made and/or caused to be made, the Individual Defendants

2    were unjustly enriched at the expense of, and to the detriment of, ZoomInfo.

3        272.    The Individual Defendants either benefitted financially from the improper conduct,

4    or received bonuses, stock options, or similar compensation from ZoomInfo that were tied to the

5    performance or artificially inflated valuation of ZoomInfo, or received compensation that was

6    unjust in light of the Individual Defendants' bad faith conduct.

7        273.    Plaintiff, as a shareholder and a representative of ZoomInfo, seeks restitution from

8    the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and

9    other compensation procured by the Individual Defendants due to their wrongful conduct and

10   breach of their fiduciary and contractual duties.

11       274.    Plaintiff, on behalf of ZoomInfo, has no adequate remedy at law.

12                              **COUNT VII**

13                      **Against the Individual Defendants**
                         **For Abuse of Control**
14

15       275.    Plaintiff incorporates by reference and realleges each and every allegation

     contained above, as though fully set forth herein.
16

17       276.    The Individual Defendants misconduct alleged herein constituted an abuse of their

     control over the Company, for which they are legally liable.
18

19       277.    As a direct and proximate cause of the Individual Defendants' abuse of control, the

20   Company has sustained substantial damages.

21       278.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

22

23

24   VERIFIED SHAREHOLDER DERIVATIVE
     COMPLAINT - 82
     Case No.  3:25-cv-05088

1

## COUNT VIII

2

### Against the Individual Defendants
### For Waste of Corporate Assets

3

4

279.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

5

6

280.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.   It resulted in continuous, connected, and ongoing harm to the Company.

7

8

9

281.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; (ii) causing the Company to repurchase millions of shares of its own common stock at artificially inflated prices; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

10

11

12

13

282.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

14

15

283.    Plaintiff, on behalf ZoomInfo, has no adequate remedy at law.

16

### PRAYER FOR RELIEF

17

WHEREFORE, Plaintiff demands judgment as follows:

18

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

19

20

21

22

B.    Directing all Individual Defendants to account for all damages caused by them and

23

24

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 83
Case No.  3:25-cv-05088

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

1    all profits and special benefits and unjust enrichment they have obtained as a result of their

2    unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock

3    sale proceeds, and imposing a constructive trust thereon;

4         C.    Awarding punitive damages;

5         D.    Awarding costs and disbursements of this action, including reasonable attorneys'

6    fees, accountants' and experts' fees, costs, and expenses; and

7         E.    Granting such other and further relief as the Court deems just and proper.

8                                **<u>JURY DEMAND</u>**

9         Plaintiff hereby demands a trial by jury.

10

11   DATED: February 4, 2025                    Respectfully submitted,

12                                             **BADGLEY MULLINS TURNER PLLC**
                                               *<u>/s/ Duncan C. Turner</u>*
13                                             Duncan C. Turner, WSBA No. 20597
                                               19910 50th Avenue W., Suite 103
14                                             Lynnwood, WA 98036
                                               Tel: (206) 621-6566
15                                             Email: dturner@badgleymullins.com
                                               ***Attorneys for Plaintiffs***

16   **OF COUNSEL:**

17   **RIGRODSKY LAW, P.A.**
     Timothy J. MacFall
18   Vincent A. Licata
     Leah B. Wihtelin
19   825 East Gate Boulevard, Suite 300
     Garden City, NY 11530
20   Telephone: (516) 683-3516
     Email: tjm@rl-legal.com
21   Email: va@rl-legal.com
     Email: lw@rl-legal.com

22   **GRABAR LAW OFFICE**
     Joshua H. Grabar
23   One Liberty Place
     1650 Market Street, Suite 3600

24   VERIFIED SHAREHOLDER DERIVATIVE
     COMPLAINT - 84
     Case No. 3:25-cv-05088

Philadelphia, PA 19103
Telephone: 267-507-6085
Email: jgrabar@grabarlaw.com

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W. Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686